# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 17, 2017        Decided August 29, 2017
Reissued February 7, 2018

No. 15-1158

CITY OF PHOENIX, ARIZONA,
PETITIONER

v.

MICHAEL P. HUERTA AND FEDERAL AVIATION
ADMINISTRATION,
RESPONDENTS

———

Consolidated with 15-1247

———

On Petitions for Review of a Decision
by the Federal Aviation Administration

———

*John E. Putnam* argued the cause for petitioner City of Phoenix, Arizona. With him on the briefs was *Peter J. Kirsch.*

*Matthew G. Adams*, pro hac vice, argued the cause for petitioners Story Preservation Association, et al. With him on the briefs was *Peter L. Gray.*

*Lane N. McFadden*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief was

*John C. Cruden*, Assistant Attorney General at the time the brief was filed.

Before: ROGERS and GRIFFITH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

Dissenting opinion filed by *Senior Circuit Judge* SENTELLE.

GRIFFITH, *Circuit Judge*: In September 2014, the Federal Aviation Administration changed longstanding flight routes in and out of Phoenix Sky Harbor International Airport. The city of Phoenix and a historic neighborhood association both petitioned for review, alleging that the FAA's action was arbitrary and capricious. We agree.

I

Phoenix Sky Harbor International Airport is one of the nation's busiest airports. To minimize the impact of the sound of aircraft on residents, the FAA historically has routed flights over industrial and agricultural parts of the City, and the City has used zoning to minimize impact on residential areas and either purchased or furnished with sound insulation the homes most affected by flight paths, at a cost of hundreds of millions of dollars.

In response to a mandate from Congress to modernize the nation's air-traffic control system, *see* FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, §§ 101(a), 213(a)(1)(A), 126 Stat. 11, 47, the FAA sought to alter the flight routes in and out of Sky Harbor and to employ satellite technology to guide planes. For consultation on its

developing plans, the FAA formed the Phoenix Airspace Users Work Group with the City and others.

One of the new flight paths the FAA devised would route planes over a major avenue and various public parks and historic neighborhoods. The new route would increase air traffic over these areas by 300%, with 85% of the increase coming from jets. The FAA consulted on the environmental impact of this and other proposed changes primarily with a low-level employee in Phoenix's Aviation Department, who warned the FAA that he lacked the expertise and authority to discuss environmental matters on the City's behalf. The FAA never conveyed the proposed route changes to senior officials in the City's Aviation Department, local officials responsible for affected parks or historic districts, or elected city officials.

As plans progressed, the FAA used computer software to model the noise impact of the proposed route changes. This modeling predicted that two areas in Phoenix, which included twenty-five historic properties and nineteen public parks, would experience an increase in noise large enough to be "potentially controversial." But the agency concluded that these projected noise levels would not have a "[s]ignificant [environmental] impact" under FAA criteria. Joint Appendix 333, 334. Based on this conclusion, the FAA issued a declaration categorically excluding the new flight routes from further environmental review. The FAA shared these conclusions with the State Historic Preservation Officer, predicting that the new noise levels would not disrupt conversation at a distance of three feet and would be no louder than the background noise of a commercial area. The State Officer concurred in this prediction.

The FAA presented the finalized flight routes in an April 2013 meeting attended by a low-level project manager of the

City's Aviation Department. The agency also sent the proposed routes and maps showing affected areas to the other low-level Aviation Department employee, with the caveat that plans were "subject to change." J.A. 302. In May 2014, the FAA notified the Phoenix Airspace Users Work Group that the new routes would take effect in September. The FAA did not share its environmental conclusions with Airport management until the day before the routes were to go into effect. Management asked the FAA to delay implementation so the public could be informed. The FAA refused.

On September 18, 2014, the FAA published the new routes, and related procedures, and made them effective immediately. The public's reaction was swift and severe: the planes supplied the sound, the public provided the fury. In the next two weeks, the Airport received more noise complaints than it had received in all of the previous year.[1] Residents complained that the flights overhead were too loud and frequent and rattled windows and doors in their homes. Some claimed that they had trouble sleeping uninterrupted, carrying on conversations outdoors, or feeling comfortable indoors without earmuffs to mute the noise.[2]

In response to the uproar, the FAA held a public meeting the next month that drew 400 attendees and hundreds of

---

[1] *See* Brittany Hargrave, *Phoenix Neighbors Protest Sky Harbor Flight-Path Change*, THE ARIZONA REPUBLIC, Sept. 30, 2014 (updated Oct. 1, 2014), http://azc.cc/YQlwu5.

[2] *See* Ashley Thompson, *Neighbors Upset at FAA's New Flight Patterns Hold Day of Protest*, KNXV, Oct. 24, 2015, http://www.abc15.com/news/region-phoenix-metro/central-phoenix/neighbors-upset-at-faas-new-flight-patterns-hold-day-of-protest.

comments.[3] There the agency promised to review the noise issue and update the City's Aviation Department. The FAA later claimed to have identified and corrected the problem: aircraft had been straying from the new routes. The agency said it was "teaming with the airport staff and industry experts" to see what more could be done about the noise levels. J.A. 609. But despite the FAA's assurances, the City continued to receive record numbers of noise complaints. In early December, the City told the FAA that public concern remained high.

That month the State Historic Preservation Officer also asked the FAA to reconsider the new routes in light of their impact on historic properties, which he said was far worse than he had been led to believe. He said he had originally concurred with the agency's optimistic projections only out of deference to the FAA's technical expertise.

Around the same time, the FAA's Regional Administrator met with Phoenix's City Council and publicly admitted, "I think it's clear that . . . [our pre-implementation procedures were] probably not enough because we didn't anticipate this being as significant an impact as it has been, so I'm certainly not here to tell you that we've done everything right and everything we should have done." J.A. 773.

A week after this concession, the City asked the agency to reopen consultation and restore the old routes until the City and

---

[3] *See* Miriam Wasser, *Sound and Fury: Frustrated Phoenix Residents Are Roaring Ever Since the FAA Changed Sky Harbor Flight Paths*, PHOENIX NEW TIMES, Mar. 4, 2015, http://www.phoenixnewtimes.com/news/sound-and-fury-frustrated-phoenix-residents-are-roaring-ever-since-the-faa-changed-sky-harbor-flight-paths-6654056; Caitlin McGlade, *FAA Will Study Solution to Flight-Path Noise*, THE ARIZONA REPUBLIC, Oct. 16, 2014 (updated Oct. 17, 2014), http://azc.cc/1waaUm9.

the agency could engage the public in discussions. In response, the FAA said it would work with the airport and airlines to investigate additional changes to the flight paths. To that end, the FAA promised to reconvene the original Working Group, assuring the City that it was "an important player in this process." J.A. 750-51. But the agency also said it could not reinstate the routes in place before September 18, 2014, because that would require a time-consuming series of related changes to air-traffic control and aircraft automation systems, as well as additional safety and environmental reviews. The FAA also declined the Preservation Officer's request to re-open environmental review of the new routes.

In mid-February and again in early April the following year, the City submitted data to the FAA purporting to show that the agency's assertions to the Preservation Officer regarding the noise impact of the new routes were "massive[ly] and material[ly]" incorrect. J.A. 814. The City also alleged that computer modeling the FAA was required to use under its own regulations showed that 40,000 additional residents would be exposed to noise loud enough to disrupt speech compared to before the new routes were implemented. And the City renewed its request that the FAA reopen a statutorily mandated consultation process with the State Preservation Office, in order to provide the City with data from the FAA's modeling, conduct an environmental review of the route changes, and find ways to either minimize the noise impact of those changes or restore the old routes.

In mid-April the FAA responded with a letter to the City that included the Working Group's final report. The report evaluated alternative routes and amended some existing routes but reaffirmed the agency's decision not to conduct further review of the new flight paths' environmental impact. And though the accompanying letter expressed the FAA's

frustration that the City had offered no alternative route proposals, the letter also conveyed the agency's promise to consider further modifications as it "continue[d] to support a collaborative approach towards addressing the community's concerns." J.A. 1036. The letter did not address the City's data, modeling, or requests. In fact, the accompanying documents disclosed that noise level reduction was not among the Working Group's stated objectives.

The City's response expressed frustration that despite initial promises, the FAA had organized the Working Group so that it would *not* address the noise issue, and had even excluded the City from meetings for fear of confrontation between the City and the airlines. Indeed, the City was not listed as a Working Group member. The City also protested that it *had* provided an alternative plan to the FAA—namely, reinstating the original routes but continuing to use satellite technology—which the City claimed would eliminate the 69% increase in residents exposed to higher noise levels and cost airlines only $700,000 more per year in fuel compared to the new routes.

In late May, the City met with the FAA and the airlines to again discuss ways to fix the noise issues. The FAA characterized these discussions as "productive" in a follow-up letter sent on June 1. J.A. 1109. The letter also listed short-term adjustments the agency could make within six months, as well as some "longer term" possibilities, which the agency could implement within a year following additional environmental review. *Id.* The letter said nothing about the City's data submissions, previous requests to reopen consultation and environmental review, proposal to return to the old routes while still using satellite technology, or exclusion from the Working Group.

Also on June 1, the City sought review in our court, characterizing the FAA's last letter as a final order. The Historic Neighborhoods filed their own petition for review in late July. The FAA moved to dismiss these petitions as untimely.

II

We must first determine whether these petitions are untimely. A petition for review of an FAA order must be filed in the Court of Appeals "not later than 60 days after the order is issued." 49 U.S.C. § 46110(a). The parties disagree over when this sixty-day clock began to run—i.e., when the FAA's decision regarding the new flight routes crystallized into final agency action. The answer is relevant because only a final action can be a reviewable "order" within the meaning of section 46110's sixty-day deadline. *See Flytenow, Inc. v. FAA*, 808 F.3d 882, 888-89 (D.C. Cir. 2015). A final order is one that "mark[s] the consummation of the agency's decisionmaking process" and that either determines "rights or obligations" or is a source of "legal consequences." *Friedman v. FAA*, 841 F.3d 537, 541 (D.C. Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

The FAA contends that its final "order" regarding the new routes issued on September 18, 2014, when the routes were formally published and put into effect. We agree. The September 2014 publication was a final order because it satisfies both prongs of the finality test.

First, the September publication marked "the consummation of the agency's decisionmaking process," *id.*, because it put the new routes into effect following extensive testing and evaluation intended to ensure that those routes would be safe and consistent with air traffic requirements, *see*

Fed. Aviation Admin., Order No. 7100.41, Performance Based Navigation Implementation Process §§ 2-3 to 2-6 (2014).

Petitioners respond that although the new routes went into effect in September, the agency's decisionmaking process regarding those routes had not yet concluded. *See Friedman*, 841 F.3d at 541. Petitioners note that the FAA's process for developing new routes actually has *five* steps, of which publication of the new routes was only the fourth. The fifth step provides for post-implementation monitoring and review, which, petitioners contend, could have led to further route changes.

But this final step is not part of the agency's "*decisionmaking* process." *Id.* (emphasis added). Rather, it consists of "Monitoring and Evaluation" of decisions already "[i]mplement[ed]," *see* Order 7100.41, *supra*, § 2-7, "to ensure" that those decisions play out "as expected," *id.* To be sure, that monitoring *might* lead to adjustments to the new routes, but by then the primary development of those routes has already happened. *Cf. Friedman*, 841 F.3d at 543 (explaining that "a vague prospect of reconsideration" does not defeat a finding of finality).

As for the second prong of the finality test, it was the September publication, and not the June 1 letter or any of the agency's other reports or communications, that determined "rights [and] obligations" and produced "legal consequences." *Id.* at 541. And it was the September publication that led to the effects petitioners now seek to reverse: increased noise in certain areas of Phoenix. We also note that the relief requested by petitioners is "vacat[ur] and remand [of the] FAA's decision to implement the [new flight] routes"—that is, of the September order. Phoenix Br. 61. Thus, petitioners implicitly recognize that the September publication, and only that

publication, determined the legal consequences they wish to challenge. We therefore conclude that the September 18, 2014 publication of the new flight routes was the relevant final "order."

The petitions thus came more than half a year too late. The review statute, however, provides that a court may allow a petition to be filed after the usual deadline "if there are reasonable grounds for not filing by the 60th day." 49 U.S.C. § 46110(a). While we "rarely [find] 'reasonable grounds' under section 46110(a)," *Elec. Privacy Info. Ctr. v. FAA*, 821 F.3d 39, 43 (D.C. Cir. 2016), we have done so in cases quite similar to this one.

For instance, in *Paralyzed Veterans of America v. Civil Aeronautics Board*, the Board promulgated a final rule but "explicitly left its rulemaking docket open in order to receive additional comments from the public." 752 F.2d 694, 705 n.82 (D.C. Cir. 1985), *rev'd on other grounds sub nom. U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597 (1986). "Aware that the rule might be undergoing modification, and unable to predict how extensive any modifications would be, petitioners elected to wait until the regulation was in final form before seeking review," six months after the final rule had been published. *Id.* We found that petitioners had shown "reasonable grounds" for late filing under a review statute materially the same as the one at issue here. [4] *See id.* (citing 49 U.S.C. § 1486(a) (1976)). In doing so, we observed that "[a]ny delay simply served properly to exhaust petitioners' administrative

---

[4] In *Paralyzed Veterans*, the petitioners had filed a petition for review within sixty days of an amended final order. But the *Paralyzed Veterans* court treated that fact as a *distinct* reason to review the petition, considering "[m]ore important[]" the fact that petitioners had shown reasonable grounds for delaying their petition for review of the *original* order. *See* 752 F.2d at 705 n.82.

remedies, and to conserve the resources of both the litigants and this court." *Id.*

Similarly, in *Safe Extensions, Inc. v. FAA*, after the FAA's publication of an advisory circular establishing certain requirements for manufacturing products provoked a "significant uproar in the industry," the FAA told the industry to ignore the existing order pending a revision. 509 F.3d 593, 603 (D.C. Cir. 2007). The petitioner, "[b]ased on these representations, and hoping to avoid litigation," decided to wait and see if the agency would address the petitioner's concerns voluntarily. *Id.* As a result, we found reasonable grounds for the petitioner's late filing. *Id.* at 604.

To be sure, in *Safe Extensions* the FAA had expressly directed the petitioner to ignore the final order, whereas here the FAA merely promised to look into possible modifications. But the key in *Safe Extensions* was that the agency left parties "with the impression that [it] would address their concerns" by replacing its original order with a revised one. *Id.* at 596. There we were concerned that the agency's comments "could have confused the petitioner and others." *Id.* at 603.

Those same concerns are present here. The FAA repeatedly communicated—in an October public meeting, in a November letter, in a December public meeting, in a January letter, in a February decision to reconvene the Working Group, in an April letter, and in a May meeting with city officials— that the agency was looking into the noise problem, was open to fixing the issue, and wanted to work with the City and others to find a solution. This pattern would certainly have led reasonable observers to think the FAA might fix the noise problem without being forced to do so by a court. And given the FAA's serial promises, petitioning for review soon after the September order might have shut down dialogue between the

petitioners and the agency. *See* Oral Arg. Tr. 58:8-13. We do not punish the petitioners for treating litigation as a last rather than a first resort when an agency behaves as the FAA did here. *See Paralyzed Veterans*, 752 F.2d at 705 n.82.

While we rarely find a reasonable-grounds exception, this is such a rare case. We hold that petitioners had reasonable grounds for their delay in filing. To conclude otherwise would encourage the FAA to promise to fix a problem just long enough for sixty days to lapse and then to argue that the resulting petitions were untimely. We therefore reach the merits of the petitions.

III

The petitioners argue that the FAA's approval of the new flight routes was arbitrary and capricious and violated the National Historic Preservation Act, the National Environmental Policy Act, the Department of Transportation Act, and the FAA's Order 1050.1E. We agree.[5]

A

Under the National Historic Preservation Act, federal agencies must "account [for] the effect of their actions on structures eligible for inclusion in the National Register of Historic Places." *Ill. Commerce Comm'n v. ICC*, 848 F.2d 1246, 1261 (D.C. Cir. 1988). In fulfilling this obligation, agencies must consult with certain stakeholders in the potentially affected areas, including representatives of local

---

[5] Petitioners also claim that the FAA violated the agency's own Order 7100.41 by excluding the City from the Working Group reconvened in the wake of the controversy over the new routes. We do not reach that argument, however, because our review is limited to the agency's September order.

governments. *See* 36 C.F.R. § 800.2(a)(4), (c)(3). If an agency determines that no historic structures will be adversely affected, it still has to "notify all consulting parties"—including a representative of the local government—and give them any relevant documentation. *Id.* § 800.5(c).

Here the FAA failed to fulfill these obligations because it consulted only low-level employees in the City's Aviation Department, whom the City had never designated as its representatives. True, the City never informed the FAA that low-level Aviation Department employees were inadequate points of contact, but that is irrelevant. Neither statute nor regulation imposes a duty on local governments to affirmatively inform the agency of their chosen representatives. Just the opposite: the agency must ask local governments who their authorized representatives are. *See id.* § 800.3(f), (f)(1). The FAA never took that step here. And the FAA's failure to notify and provide documentation to the City of the agency's finding of no adverse impact violated regulations under the Preservation Act, and denied the City its right to participate in the process and object to the FAA's findings. *See id.* §§ 800.2(c)(3), 800.5(c)(2).

Additionally, unless confidential information is involved, agencies must "provide the public with information about an undertaking and its effects on historic properties *and* seek public comment and input." *Id.* § 800.2(d)(2) (emphasis added). The FAA admits, however, that it did not make "local citizens and community leaders" aware of the proposed new routes and procedures, J.A. 364, and it does not claim that any confidentiality concerns applied.

Further, by keeping the public in the dark, the agency made it impossible for the public to submit views on the project's potential effects—views that the FAA is required to

consider. *See* 36 C.F.R. § 800.5(a); *see also Am. Bird Conservancy v. FCC*, 516 F.3d 1027, 1035 (D.C. Cir. 2008) ("Interested persons cannot request an [environmental assessment] for actions they do not know about, much less for actions already completed.").

B

Under the National Environmental Policy Act (NEPA), federal agencies must assess and disclose the environmental impacts of "major" actions prior to taking those actions. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.1. This process "ensures" that *before* an agency acts, it will "have available" and "carefully consider[] detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). The process also "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of [the] decision." *Id.*

NEPA's requirements vary based on the type of agency action in question. Actions with significant environmental effects require a full environmental-impact statement. Actions with impacts that are not significant or are unknown require a briefer environmental assessment. And actions "which do not individually or cumulatively have a significant effect on the human environment" can be categorically excluded from any environmental review. 40 C.F.R. § 1508.4.

However, the FAA may not categorically exclude an action from environmental review if "the Administrator determines that extraordinary circumstances" would counsel otherwise. FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, § 213(c)(1), 126 Stat. 11, 49. Under the FAA's

own regulations, extraordinary circumstances exist when an action's effects "are likely to be highly controversial on environmental grounds." Fed. Aviation Admin., Order No. 1050.1E, Environmental Impacts: Policies and Procedures ¶ 304i (2004). Here, the FAA found that the new routes were "not likely to be highly controversial on environmental grounds," and thus determined that no extraordinary circumstances existed. That determination was arbitrary and capricious.

The FAA's determination was arbitrary in light of the agency's admitted failure to notify "local citizens and community leaders" of the proposed new routes before they went into effect. J.A. 364, 367. This failure made it impossible for the FAA to take into account "[o]pposition on environmental grounds by a . . . State, or local government agency or by . . . a substantial number of the persons affected by the [FAA's] action." Order 1050.1E, *supra*, ¶ 304i; *cf. Am. Bird Conservancy*, 516 F.3d at 1035 (faulting the agency for its lack of diligence in informing and involving the public since "[i]nterested persons cannot request an [environmental assessment] for actions they do not know about, much less for actions already completed").

The FAA argues that it was reasonable simply to assume that its proposal would not be controversial on environmental grounds, given that the agency had "confirmed that no significant noise impacts were anticipated at all, received the concurrence of the State Historic Preservation Officer[,] who expressed no concerns, and then further discussed the finding with the Airport Authority[,] [which] also expressed no concerns." FAA Br. 80. Common sense reveals otherwise. As noted, the FAA's proposal would increase by 300% the number of aircraft flying over twenty-five historic neighborhoods and buildings and nineteen public parks, with 85% of the new flight

traffic coming from jets. The idea that a change with these effects would not be highly controversial is "so implausible" that it could not reflect reasoned decisionmaking. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The FAA also erred by deviating from its usual practice in assessing when new flight routes are likely to be highly controversial, without giving a "reasoned explanation for . . . treating similar situations differently." *W. Deptford Energy, LLC v. FERC*, 766 F.3d 10, 20 (D.C. Cir. 2014). In assessing proposed route changes at airports in Boston, Northern California, Charlotte, and Atlanta, the FAA has relied on its general observation that a proposal is likely to be highly controversial if it would increase sound levels by five or more decibels in an area already experiencing average levels of 45-60 decibels. But here the agency said exactly the opposite and never explained its about-face. The FAA replies that "[e]ach airport is different and the potential effects of any changes at those airports will differ as well." FAA Br. 81. But that does not explain how the Phoenix plan could be less likely to stir controversy than other plans that had *the same* projected impact. Thus, the agency acted arbitrarily in departing from its usual determinations regarding when a projected noise increase is likely to be highly controversial.

In short, the FAA had several reasons to anticipate that the new flight routes would be highly controversial: The agency was changing routes that had been in place for a long time, on which the City had relied in setting its zoning policy and buying affected homes. The air traffic over some areas would increase by 300%—with 85% of that increase attributed to jets—when before only prop aircraft flew overhead. The FAA found a "potential [for] controversy" but did not notify local citizens and community leaders of the proposed changes as the

agency was obligated to, much less allow citizens and leaders to weigh in.[6] And the agency departed from its determinations in materially identical cases. Thus, the FAA acted arbitrarily in finding under Order 1050.1E that the new routes were unlikely to be highly controversial and could thus be categorically excluded from further environmental review.

C

Petitioners also raise two claims related to the Transportation Act's section 4(f). First, they argue that the FAA violated its duty to consult with the City in assessing whether the new routes would substantially impair the City's parks and historic sites. Second, petitioners claim that the FAA was wrong to find that the routes would *not* substantially impair these protected areas. We agree on both points.

i

Section 4(f) of the Transportation Act calls for "special effort[s] to preserve the natural beauty of . . . public park and recreation lands . . . and historic sites." 49 U.S.C. § 303(a). To that end, the FAA's regulations require it to consult "*all* appropriate . . . State[] and *local officials having jurisdiction* over the affected section 4(f)" areas when assessing whether a noise increase might substantially impair these areas. Order 1050.1E, *supra*, ¶ 6.2e (emphases added). According to the

---

[6] Although at times it may be difficult to identify precisely who must be notified, the FAA's regulatory acknowledgment of its obligation has narrowed the field. Here, given the changes about to occur, it was unreasonable to ignore elected local officials once the FAA was on notice that the Aviation Department employee lacked authorization to speak for the City of Phoenix. *See infra* Part III.C (discussing FAA regulations under section 4(f) of the Transportation Act).

City, the agency violated this requirement by not consulting the proper city officials about the proposed flight routes in Phoenix. *Cf. Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980) ("Agencies are under an obligation to follow their own regulations, procedures, and precedents, or provide a rational explanation for their departures.").

The FAA responds that it *did* consult employees in the City's Aviation Department, and that at the time the City didn't tell the agency what the City now asserts: that those employees lacked authority to speak for the City regarding the new flight routes. Thus, the FAA contends, its failure to consult other local officials was not arbitrary.

We are not persuaded. As noted, the FAA spoke mainly with one low-level employee in the City's Aviation Department and occasionally with other low-ranking members of the department. But it was unreasonable for the agency simply to assume that low-level Aviation Department employees had jurisdiction over the historic sites and public parks protected by section 4(f), much less that these employees (along with the State Historic Preservation Officer) represented *all* the local officials with such jurisdiction, as the agency's consultation duties required. Besides, the FAA cites no evidence that it consulted with these City officials on historic sites and public parks in particular. Thus, the FAA's consultation process was arbitrarily confined.

ii

Section 4(f) also provides that a federal transportation project may "use" a public park or historic site only if "there is no prudent and feasible alternative to using that land." 49 U.S.C. § 303(c)(1). A project makes "constructive use" of a

protected area if the project would "substantially impair" that area. Order 1050.1E, *supra*, ¶ 6.2e. And a project substantially impairs an area if it "substantially diminish[es]" the "activities, features, or attributes . . . that contribute to its enjoyment." *Id.* ¶ 6.2f. For instance, a project would make constructive use of a park if it subjected the park to aircraft noise "at levels high enough to have negative consequences of a substantial nature that amount to a taking." *Id.* In that case, the project could lawfully proceed only if there was no prudent and feasible alternative to using the park.

In determining whether a transportation project would substantially impair an area protected under section 4(f), the FAA may rely on guidelines set forth in 14 C.F.R. pt. 150 (the Part 150 guidelines), including the directive "to evaluate impacts on historic properties that are in use as residences." Order 1050.1E, *supra*, ¶ 6.2h. But the Part 150 guidelines "may *not* be sufficient to determine the noise impact" on historic residences if "a quiet setting is a generally recognized purpose and attribute" of those residences. *Id.* (emphasis added). Here the FAA found that a quiet setting was not a recognized purpose of the affected historic homes, neighborhoods, and sites, so the agency relied only on the Part 150 guidelines in assessing the noise impact on those sites. And on that basis, it concluded that the increased noise would not substantially impair the historic buildings and areas in question.

The City contends that it was unreasonable for the FAA to rely only on the Part 150 guidelines, because the agency didn't have enough information to tell if the areas affected here were generally recognized as quiet settings. We agree.

As evidence that these sites were not "generally recognized" as quiet settings, the FAA pointed to the sites' urban location. *Id.* But that isn't enough: even in the heart of a

city, some neighborhoods might be recognized as quiet oases. The agency also observed that planes were flying over the affected historic sites even before the new routes took effect. But those earlier flights involved propeller aircraft that flew far less often, so the homes beneath them might still have been generally recognized as "quiet setting[s]." *Id.*

Thus, it was unreasonable for the agency to rely only on the Part 150 guidelines in concluding that noise from the new flight routes would not substantially impair the affected historic sites. As a result, that conclusion lacks substantial supporting evidence. For both these reasons, we find that the agency's substantial-impairment analysis was arbitrary and capricious. *See BFI Waste Sys. of N. Am. v. FAA*, 293 F.3d 527, 532 (D.C. Cir. 2002) (observing that an agency's action is arbitrary and capricious if it is "'not supported by substantial evidence' in the record as a whole" (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. Ruckelshaus*, 719 F.2d 1159, 1164 (D.C. Cir. 1989))); *see also State Farm*, 463 U.S. at 43 ("We may not supply a reasoned basis for the agency's action that the agency itself has not given." (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947))).

IV

For the foregoing reasons, we grant the petitions, vacate the September 18, 2014 order implementing the new flight departure routes at Sky Harbor International Airport, and remand the matter to the FAA for further proceedings consistent with this opinion.

*So ordered.*

SENTELLE, *Senior Circuit Judge*, dissenting:

I respectfully dissent from the majority's opinion in this case, not because I disagree with the merits but because I believe the court should not reach them. I therefore express no opinion on the merits and instead disembark at the question of timeliness.

As the majority acknowledges, petitions for review of an FAA order must be filed "not later than 60 days after the order is issued." 49 U.S.C. § 46110(a); *see* Maj. Op. at 8. Nevertheless, as my colleagues note, the petitions in this case were filed "more than half a year too late." Maj. Op. at 10. Such late filing is excused "only if there are reasonable grounds for not filing" within the 60-day period. § 46110(a); *see* Maj. Op. at 10. The majority relies on two cases, *Paralyzed Veterans of America v. Civil Aeronautics Board*, 752 F.2d 694 (D.C. Cir. 1985), *rev'd on other grounds sub nom. U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597 (1986), and *Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007), for its conclusion that reasonable grounds exist in the present case. *See* Maj. Op. at 10-12. Both cases, however, are distinguishable.

As my colleagues in the majority acknowledge, in *Paralyzed Veterans*, "the Board promulgated a final rule but 'explicitly left its rulemaking docket open in order to receive additional comments from the public.'" Maj. Op. at 10 (citing *Paralyzed Veterans*, 752 F.2d at 705 n.82). This unusual circumstance, prompting the petitioners to wait for further changes to the rule before filing for review, constituted reasonable grounds within the meaning of § 46110(a). And, as the majority acknowledges in discussing *Safe Extensions*, that case involved the FAA instructing parties to ignore an order as it would be modified and revised. *Safe Extensions*, 509 F.3d at 603; Maj. Op. at 10-11. The petitioner accordingly waited to file and, given that unique context, we concluded

reasonable grounds existed for delayed filing. *Safe Extensions*, 509 F.3d at 604. These factual contexts are distinguishable from the present case, in which the FAA never promised to suspend the existing order and explicitly had the new flight paths continue while it considered the possibility of future changes. Mere agency acknowledgment of the possibility of future modification is not a rare circumstance; *Paralyzed Veterans* and *Safe Extensions* are instead the truly rare circumstances of an agency explicitly inducing warranted delay by a putative petitioner. Agencies are often welcome to re-initiate the decision-making process at some future point and to follow the necessary procedures to change their minds — this mere possibility, or even the mention of it, cannot be enough to excuse a petitioner's failure to file within the statutorily mandated 60-day period. Otherwise, the statutory limit would cease to have meaning.

Instead, as we observed in *Electronic Privacy Information Center v. FAA*, 821 F.3d 39, 43 (D.C. Cir. 2016), "[w]e have rarely found 'reasonable grounds' under section 46110(a)." *Safe Extensions* (and, by comparison, *Paralyzed Veterans*) is the "rare instance[]" of such reasonable grounds, not the rule. *Nat'l Fed'n of the Blind v. U.S. Dep't of Transp.*, 827 F.3d 51, 57 (D.C. Cir. 2016). Because reasonable grounds are so infrequent, the onus is almost always on the petitioners to protect themselves and file within the 60-day timeframe. The FAA's failure to act with perfect clarity is not sufficient to remove petitioners' duty to protect themselves. *See, e.g.*, *Nat'l Fed'n of the Blind*, 827 F.3d at 57-58; *Elec. Privacy Info. Ctr.*, 821 F.3d at 42-43; *Avia Dynamics, Inc. v. FAA*, 641 F.3d 515, 521 (D.C. Cir. 2011). Mere confusion over where or when to file, lack of clarity by the FAA in its communications, ignorance, and lack of notice do not suffice, at least independently, to qualify as reasonable grounds for delay under § 46110(a) and our precedent. *See Nat'l Fed'n of the Blind*,

827 F.3d at 57-58; *Elec. Privacy Info. Ctr.*, 821 F.3d at 42-43; *Avia Dynamics*, 641 F.3d at 521. Such grounds are rare and found in unique circumstances, such as *Safe Extensions* and agency procurements of delay by promising a new order and instructing parties to ignore the prior one, or *Paralyzed Veterans* and an agency leaving its rulemaking docket open during the modification process, where delay "simply served properly to exhaust petitioners' administrative remedies," 752 F.2d at 705 n.82. No such unusual facts are in the present case. I would determine that petitioners lacked reasonable grounds for untimely filing.

I note in passing the majority's references to petitioners' notice and knowledge of the FAA's proceedings having come through "low-level" employees. *See* Maj. Op. at 3-4, 13. I do not see that this can help establish reasonable grounds for any delay, let alone one stretching six months beyond the 60-day statutory provision. There was ample time for the higher-ups to gain and act on adequate knowledge.

In concluding that petitioners did not have reasonable grounds for waiting six months to file for review, I do not contend that the FAA acted with perfect clarity at all times. However, the record does not suggest to me that petitioners had a clear reason, akin to those rare instances present in *Paralyzed Veterans* and *Safe Extensions*, to forego at the very least a protective filing. For this reason, I would decide this case on the question of timeliness, deny the petitions for review, and decline to reach the merits of their arguments.