# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 14, 2019　　　Decided March 10, 2020

No. 18-1173

STATE OF MARYLAND,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION AND STEPHEN DICKSON,
ADMINISTRATOR OF THE FEDERAL AVIATION
ADMINISTRATION,
RESPONDENTS

On Petition for Review of Actions Taken
by the Federal Aviation Administration

*W. Eric Pilsk* argued the cause for petitioner. With him on the briefs were *Brian E. Frosh*, Attorney General, Office of the Attorney General for the State of Maryland, and *Samatha R. Caravello*.

*Lane N. McFadden*, Attorney, Federal Aviation Administration, argued the cause for respondents. With him on the brief were *Jeffrey Bossert Clark*, Assistant Attorney General, U.S. Department of Justice, *Eric Grant*, Deputy Assistant Attorney General, and *J. David Gunter II*, Attorney.

Before: HENDERSON, TATEL and KATSAS, *Circuit Judges*.

Opinion for the Court filed by HENDERSON, *Circuit Judge*.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In 2015, the Federal Aviation Administration (FAA or Agency) amended three north-to-south approach paths to Ronald Reagan Washington National Airport (Reagan National or Airport). The State of Maryland (State)—believing the amendments concentrated aircraft noise over its public lands—asks us to vacate the new flight paths because the FAA failed to conduct required environmental assessments before implementing them. The State acknowledges that its petition was filed well after the statutory sixty-day review window but claims it had "reasonable grounds" to delay. We disagree.

I

Reagan National is managed by the Metropolitan Washington Airports Authority (MWAA), an independent agency composed of federal and local government representatives, including three directors appointed by the Maryland Governor.[1] Due to the Airport's location in the heart of the densely populated National Capital Region, aircraft noise is continual in its surrounding communities. Because "[t]he aircraft and its noise are indivisible," *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 628 (1973) (quoting *Am. Airlines, Inc. v. Town of Hempstead*, 272 F. Supp. 226, 230 (E.D.N.Y. 1967), *aff'd*, 398 F.2d 369 (2d Cir. 1968)), aircraft noise can be relocated away from nearby residential areas by rerouting arrivals and departures only. With little unpopulated land in the area, "local communities have

---

[1] A detailed explanation of how the National Capital Region's three major airports are managed and operated is set out in *Citizens Ass'n of Georgetown v. FAA*, 896 F.3d 425, 427–29 (D.C. Cir. 2018).

encouraged use of the Potomac River corridor to reduce flights over noise-sensitive areas" for decades. Resp'ts' Br. 4–5.

The FAA shoulders the burden of balancing "the safety of aircraft and the efficient use of airspace," 49 U.S.C. § 40103(b)(1), with the State's noise concerns because "[t]he United States Government has exclusive sovereignty of airspace of the United States," *id.* § 40103(a)(1). But it does not regulate in a vacuum. Federal law—including, as relevant here, the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C), the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108, and the Department of Transportation Act, 49 U.S.C. § 303(c)—mandates that environmental assessments precede certain major federal actions, with aircraft noise among the factors the FAA must consider in making the assessments. *See* 14 C.F.R. pt. 150.

The FAA amended three approach paths into Reagan National during 2015.[2] That October, after the first two amendments were published and had taken effect, the MWAA established the Reagan National Airport Community Working Group (Working Group) "in response to increasing community concerns regarding aircraft noise affecting residential areas in the District of Columbia, Virginia and Maryland along the Potomac and Anacostia rivers." *Organizational Charter*,

---

[2] The RNAV (RNP) RWY 19 (RNAV RNP) and LDA Z RWY 19 (LDA Z) approaches were amended in April 2015 and later, in December, the RIVER VISUAL RWY 19 Chartered Visual Flight (River Visual) approach was amended. Pilots flying the River Visual approach (by far the most common of the three) follow the Potomac River and other ground landmarks "visually." RNAV RNP follows the River Visual approach path but enables equipped aircraft to use navigational technology in order to more closely track certain portions of it. LDA Z is a straight-line instrument approach, largely over Maryland, that aircraft use in limited-visibility conditions.

REAGAN NAT'L CMTY. WORKING GRP. 1 (Oct. 28, 2015), https://www.flyreagan.com/sites/default/files/reagan_national _working_group_organizational_charter_revised_29oct_2015 .pdf. The Working Group was "designed . . . to move the noise discussion beyond the airing of individual and neighborhood complaints toward a cooperative effort to identify practical solutions." *Id.*

On December 10, 2015—the day it implemented the last of the three amendments—the FAA informed the Working Group of all three amendments and "began assuring the public that it would work cooperatively to implement further changes to address noise concerns." Pet'r's Br. 37. The parties' working relationship started well but deteriorated over time. Unable to agree on alternative flight paths, the State's frustration mounted and ultimately boiled over when, in April 2018, Acting FAA Administrator Daniel Elwell, in response to a letter from the Governor, informed the State that "the time for Maryland to commence litigation . . . is long past" and that "[t]o the degree any discussions we might have result in proposed changes to air traffic routes or procedures, those would be new Federal actions . . . ." J.A. 836. The State claims that the FAA's reply "created additional uncertainty and reasonably prompted [it] to preserve its rights by filing this petition" on June 26, 2018. Pet'r's Br. 43. Its petition alleges the FAA "provided no public notice of the substance of the changes it was contemplating, afforded no opportunity for public comment, engaged in no modeling or assessment of potential noise impacts, performed no analysis under NEPA, and made no effort to comply with the NHPA or [the Department of Transportation Act]." *Id.* at 16. The FAA subsequently moved to dismiss the petition as untimely and the State then moved to amend its petition to include two additional versions of the FAA's amended approach procedures. Because timeliness is a threshold issue, we address the FAA's motion first.

5

II

"Federal law requires that petitions seeking review of FAA actions be filed within sixty days of the agency's final order unless the petitioner had 'reasonable grounds' for delay." *Citizens Ass'n of Georgetown v. FAA*, 896 F.3d 425, 427 (D.C. Cir. 2018) (quoting 49 U.S.C. § 46110(a)). Accordingly, we must determine when the FAA's orders became final. "First, to qualify as final, an order must mark the consummation of the agency's decisionmaking process; and second, it must either determine rights or obligations or be a source of legal consequences." *Id.* at 431 (citing, *inter alia*, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (brackets, quotation marks and additional citations omitted).

This part of our review is straightforward because the issue is identical to the issue we confronted in *Citizens Ass'n of Georgetown* and *City of Phoenix v. Huerta*, 869 F.3d 963 (D.C. Cir. 2017). In those cases, we held that the FAA's action became final upon publication of the updated flight routes. *See Citizens Ass'n of Georgetown*, 896 F.3d at 433; *City of Phoenix*, 869 F.3d at 969. Here, the RNAV RNP and LDA Z approaches were published in April 2015 and the River Visual approach was published in December 2015. Notwithstanding the State's argument that the FAA delayed publishing the first two amendments, it is undisputed that all three amendments were final by December 2015. *See* Pet'r's Br. 16–17.

"Filing deadlines, replete throughout the United States Code, promote prompt and final judicial review of agency decisions and ensure that agencies and affected parties can proceed free from the uncertainty that an action may be undone at any time." *Citizens Ass'n of Georgetown*, 896 F.3d at 436–37. That Maryland did not file its petition within sixty days of the FAA's final action is an understatement, as well over nine

hundred days elapsed between December 10, 2015 and June 26, 2018. The State's case, therefore, hinges on whether "reasonable grounds" justified its delay. *See* 49 U.S.C. § 46110(a).

We have previously found reasonable grounds for delay in few cases. First, in *Paralyzed Veterans of Am. v. Civil Aeronautics Bd.*, 752 F.2d 694 (D.C. Cir. 1985), *rev'd on other grounds*, 477 U.S. 597 (1986), we found timely a petition filed six months after the agency's final rule—i.e., roughly four months late—because the agency "explicitly left its rulemaking docket open in order to receive additional comments from the public," *id.* at 705 n.82. Moreover, that petition was filed within sixty days of the agency's amended rule. *Id.* Next, in *Safe Extensions, Inc. v. FAA*, 509 F.3d 593 (D.C. Cir. 2007), we found reasonable grounds for delay when, following an "uproar" in the affected industry, the FAA told the petitioner and others to "ignore" its order, *id.* at 603. Most recently, in *City of Phoenix*—the precedent on which the State chiefly relies—we found reasonable grounds for filing a petition roughly six months outside the statutory window. 869 F.3d at 970. Maryland argues that a "similar fact pattern [to *City of Phoenix*] exists here" because the FAA "immediately signaled that it was willing to work with the [Working] Group on possible revisions" as soon as the new approaches were implemented. Pet'r's Br. 38–39. The State argues that "petitioning for review soon after the . . . order might have shut down dialogue between the petitioners and the agency" and that treating its petition as untimely would "punish the petitioners for treating litigation as a last rather than a first resort." *City of Phoenix*, 869 F.3d at 970; *see also* Pet'r's Br. 37–38.

Granted, in *City of Phoenix* the FAA did not expressly cast doubt on the finality of its order as it did in *Paralyzed Veterans*

and *Safe Extensions*. And there, as here, the FAA displayed a "pattern" of "serial promises" that it was considering the petitioner's noise concerns after altering the flight paths. *City of Phoenix*, 869 F.3d at 970. But these similarities do not save the State's petition. The key distinction between this case and *City of Phoenix* is the FAA's near constant engagement with petitioner City of Phoenix throughout the period between the new flight paths' implementation and the City's late petition. In *City of Phoenix* we emphasized that:

> The FAA repeatedly communicated—in an *October* public meeting, in a *November* letter, in a *December* public meeting, in a *January* letter, in a *February* decision to reconvene the Working Group, in an *April* letter, and in a *May* meeting with city officials—that the agency was looking into the noise problem, was open to fixing the issue, and wanted to work with the City and others to find a solution.

*Id.* (emphases added). With one exception, each month the FAA expressed its commitment to fix the noise problem between its September order and the June petition. "This pattern would certainly have led reasonable observers to think the FAA might fix the noise problem without being forced to do so by a court." *Id.* In *City of Phoenix*, we worried that rigidly enforcing the deadline "would encourage the FAA to promise to fix a problem just long enough for sixty days to lapse and then to argue that the resulting petitions were untimely." *Id.*

This case is quite different. Here, continuous FAA engagement with the State did not occur. Throughout the more than two and one-half years during which Maryland delayed filing its petition, its communications with the FAA were almost entirely self-initiated, sporadic and primarily through

the Working Group. Even though the FAA actively participated in the Working Group, *see*, *e.g.*, J.A. 768 (FAA presentation on Runway 19 arrivals), the Agency's statements at those meetings never suggested that it intended to amend the challenged procedures further.

Although reasonable grounds for delay can exist if an *agency's* words and actions reasonably call into question the finality of its action, a *petitioner* cannot wait indefinitely for an unresponsive agency, decide that "cooperation" has ceased and the sixty-day review period has begun and finally petition for review over two years out of time, as the State did here. *See* Pet'r's Br. 24–25 ("Given the uncertainty caused by the FAA's lack of response, and to preserve its ability to challenge the FAA's lack of environmental analysis before amending the Runway 19 approach procedures, Maryland filed a petition for review . . . ."); *see also Eagle-Picher Indus., Inc. v. EPA*, 759 F.2d 905, 912 (D.C. Cir. 1985) ("[I]t is the responsibility of petitioners to file for review within the period set by Congress."). Indeed, if not for the FAA's terse reply to Governor Hogan's letter in 2018, the State's theory suggests that the sixty-day deadline may *still* not have expired, more than four years after the approaches were altered. Notwithstanding *City of Phoenix* incrementally expanded "reasonable grounds," it did not open the floodgates to petitions filed years after final agency action. Because the State's delay was extreme, it lacks reasonable grounds for missing the sixty-day deadline and its petition is therefore untimely.

Finally, we note that here, as in *City of Phoenix* and *Citizens Ass'n of Georgetown*, "[t]he FAA's efforts . . . were hardly a model of sound agency practice." *Citizens Ass'n of Georgetown*, 896 F.3d at 436. In each of these cases, the FAA appears to have given short shrift to the required environmental analyses and, in *City of Phoenix*—the only timely petition of

the three—we said so. *See* 869 F.3d at 970–75. The sixty-day window prescribed by 49 U.S.C. § 46110(a) is admittedly short—especially for local governments and citizens groups, the most likely challengers of altered flight paths—but is nonetheless the deadline the Congress has imposed. At the same time, we caution the FAA that the short review period is a shield, not a sword. It serves the Federal Aviation Act's "delicate balance between safety and efficiency and the protection of persons on the ground," *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 434 (D.C. Cir. 2013) (quoting *City of Burbank*, 411 U.S. at 638–39), by protecting the FAA from uncertainty and inefficiency if, years down the road, its actions are subject to challenge. The deadline, however, does not authorize the FAA to lull potential petitioners into believing that its actions remain non-final in order to ward off a timely challenge.

For the foregoing reasons, we dismiss the State's petition as untimely and deny its motion to amend as moot.

*So ordered.*