# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 23, 2016     Decided November 15, 2016

No. 16-1007

ERIC FRIEDMAN,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

———

On Petition for Review of an Order
of the Federal Aviation Administration

———

*Z.W. Julius Chen* argued the cause for Petitioner. With him on the briefs were *Gregory S. Walden* and *William Mongan*. *Pratik A. Shah* entered an appearance.

*Amanda Kate Bruchs*, Attorney, Federal Aviation Administration, argued the cause and filed the brief for Respondent. *Michael S. Raab* and *Abby C. Wright*, Attorneys, U.S. Department of Justice, entered appearances.

*Neal Kumar Katyal* and *Jaclyn L. DiLauro* were on the brief for *amicus curiae* The American Diabetes Association in support of Petitioner.

Before: ROGERS, BROWN and PILLARD, *Circuit Judges*.

Opinion for the Court filed by BROWN, *Circuit Judge*.

BROWN, *Circuit Judge*:

"I've never known an industry that can get into people's blood the way aviation does."
> *- Robert Six, founder of Continental Airlines*

Petitioner Eric Friedman ("Friedman"), a commercial airline pilot, claims Respondent Federal Aviation Administration ("the FAA" or "the Agency") has behaved in an arbitrary and capricious manner in assessing his request for a commercial airline pilot's license. Friedman has been diagnosed with Insulin Treated Diabetes Mellitus ("ITDM"), and although he holds a *third* class medical certificate authorizing him to pilot non-commercial flights in the United States, he seeks the *first* class certificate necessary to serve as a commercial airline pilot. He argues the FAA has impermissibly conditioned issuance of a first class license on ninety days of continuous blood glucose monitoring, a costly and invasive procedure not medically necessary for his care. Since we believe the Agency's unwavering position constitutes final action, we remand to the FAA to provide reasons for its denial.

## I.

Congress has granted the FAA broad authority to regulate those "practices, methods, and procedure[s] the Administrator finds necessary for safety in air commerce and national security." 49 U.S.C. § 44701(a)(5). Accordingly, the FAA issues airman certificates to pilots who are "qualified for, and physically able to perform the duties related to, the position." *Id.* § 44703(a). The Agency has also established rules requiring pilots to hold both a medical certificate and a pilot

certificate.  *See, e.g.*, 14 C.F.R. § 61.3(a) & (c).  The FAA lists a number of conditions generally disqualifying for any class of medical certification, among them a "medical history or clinical diagnosis of diabetes mellitus that requires insulin or any other hypoglycemic drug for control," otherwise known as ITDM.   14 C.F.R. §§ 67.113(a), 67.213(a), 67.313(a).  While a diagnosis of ITDM generally excludes a pilot from any medical certificate issued by the FAA pursuant to 49 U.S.C. § 44703(a), the FAA has the discretionary authority to grant exceptions to the medical regulations contained in 14 C.F.R. § 67.  *See* 49 U.S.C. § 44701(f).  An Authorization for Special Issuance of a Medical Certificate may be provided to an applicant with a disqualifying condition "if the person shows to the satisfaction of the Federal Air Surgeon that the duties authorized by the class of medical certificate applied for can be performed without endangering public safety during the period in which the Authorization would be in force."  14 C.F.R. § 67.401(a).

Regulations require the Federal Air Surgeon ("FAS") to make his determination using standards published for each condition as set forth in the FAA's Guide to Aviation Medical Examiners ("AME Guide").  *See id.* § 67.407(a).  The process includes a medical examination performed by a member of the community of Aviation Medical Examiners ("AME"s), *see id.* § 67.401(a), and it may require pilots to provide additional medical information to the FAA where necessary, *see id.* § 67.413(a).  Specifically, the FAS must "consider[] the need to protect the safety of persons and property in other aircraft and on the ground."  *Id.* § 67.401(e).

For much of its history the FAA enforced a blanket ban on the issuance of medical certificates to individuals with ITDM, but in 1996 it reversed course and established criteria for pilots with ITDM to receive a third class medical

certificate (but *not* a first class certificate). Since the policy change was adopted, there has been no medically related accident, incident, or inflight incapacitation, from any cause, of any such insulin treated special issuance pilot. In light of the strong record of third class pilots with ITDM, and in reliance on the expert analysis provided by an Expert Panel on Pilots with Insulin Treated Diabetes ("Expert Panel")— convened by the American Diabetes Association ("ADA") at the FAA's request—the FAA amended its AME Guide to broaden the third class ITDM protocol to all classes of medical certificates on April 21, 2015.

On April 27, 2015, Friedman submitted a completed application for a first class license to the FAA. A few days later, on April 30, 2015, the FAA requested supplemental information, including "any and all information that you may have that is relevant to your condition, which may include . . . (if applicable) continuous glucose monitor readings." JA 73. The next month, Friedman inquired as to the FAA's method for evaluating glucose testing results and stated "I do not use a continuous glucose monitor." JA 31–32. Continuous Glucose Monitoring ("CGM"), according to the ADA, is an invasive procedure that "uses a sensor inserted under the skin to check glucose levels in tissue fluid. A transmitter sends information about glucose levels via radio waves from the sensor to a wireless monitor." ADA Amicus Br. 14. This technique provides a "historical record of glucose levels over time" and can "provid[e] helpful information about historic trends in one's blood sugar levels and how those levels have been affected by diet and exercise." *Id*. However, CGM data is not as accurate as other blood glucose measures like fingersticks. *Id*. 15–16. Moreover, CGM is costly and is not covered by insurance unless medically necessary.

5

On June 17, 2015, just two days after Friedman wrote to the FAA to note the Agency had requested information beyond its own published evaluation protocol, the FAA revised its AME Guide. The newly-minted version provided "[f]irst and second class applicants will be evaluated on a case-by-case basis by the Federal Air Surgeon's Office" and omitted any protocol for evaluation. JA 469. Later, on October 6, 2015, the FAA again requested Friedman provide "any and all information that you may have that is relevant to your condition, which may include . . . [a] report for continuous glucose monitoring (CGM) conducted for a minimum of 90 days." JA 71. The letter informed Friedman his application would be denied if he did not indicate he planned to comply with the request within *sixty* days. JA 72. In response, Friedman again advised the FAA he did not possess any CGM data. This time, however, Friedman also presented letters from his physicians explaining CGM was not medically necessary in his case. The Expert Panel even submitted a letter in support of Friedman's application to explain, "CGM systems have value, [but] they are neither necessary nor appropriate for making decisions on medical certification of pilots with diabetes" and are less accurate than the blood glucose data Friedman had already submitted. JA 65–66. On November 13, 2015, the FAA wrote to Friedman yet *again* to request CGM data and *again* cautioned that failure to respond within *thirty* days with an agreement to supply CGM data would result in denial of his application.

Thereafter, on December 1, 2015, the FAA wrote Friedman to explain it was "unable to proceed with further determination of [his] potential eligibility for special issuance of a first-class airman medical certificate until [the Agency] receive[d] the [CGM] information previously requested . . . ." JA 53. On December 18, 2015, the FAS sent an additional letter informing Friedman his request for a first class

certification "remains under consideration" and granting him a third class certificate—the certificate level he already held. JA 47–48.[1]  Specifically, the letter noted the FAS had reviewed the information submitted in Friedman's April 27, 2015 application and granted the third class license in response.  *Ibid.*  It further advised Friedman "should not undergo a new FAA medical examination until advised to do so by the Aerospace Medicine Certification Division (AMCD)."  JA 48.

## II.

The threshold question in this case is whether the FAA has, either actually or impliedly, issued a final order eligible for judicial review.  The Administrative Procedure Act ("APA") authorizes judicial review of "final agency action for which there is no other adequate remedy in a court," and "[a]gency action made reviewable by statute."  5 U.S.C. § 704.  And, while Section 46110 of the Federal Aviation Act authorizes judicial review of an "order" and omits any explicit finality requirement, this Circuit has "incorporated generally applicable finality principles into the analysis of what counts as an 'order' under section 46110."  *Flytenow, Inc. v. FAA*, 808 F.3d 882, 888–89 (D.C. Cir. 2015).

Here, the FAA contends it did not issue a final order regarding Friedman's first class medical certificate

---

[1] On November 12, 2015, Friedman had applied to the FAA for a renewal of his third class medical certificate due to expire on December 31, 2015.  While Friedman alleges the FAA altered his first class application in granting his request for a third class certificate, he has presented no evidence suggesting this was done in bad faith.  Without evidence to the contrary, "[w]e must presume an agency acts in good faith."  *Comcast Corp. v. FCC*, 526 F.3d 763, 769 n.2 (D.C. Cir. 2008).

application; it purportedly ruled solely on his independent request for a third class medical certificate and specifically indicated the first class certificate remained under review. *See* JA 47–48, 53. Accordingly, the Court initially considers whether the Agency's admitted actions nonetheless meet the two-part test of finality:

> First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). Case law interpreting this standard is "hardly crisp," and it "lacks many self-implementing, bright-line rules, given the pragmatic and flexible nature of the inquiry as a whole." *Rhea Lana, Inc. v. Dep't of Labor*, 824 F.3d 1023, 1027 (D.C. Cir. 2016). As a general principle, therefore, "the term 'order' in [Section 46110] should be read expansively." *City of Dania Beach v. FAA*, 485 F.3d 1181, 1187 (D.C. Cir. 2007).

The specific facts presented here establish a constructive denial of Friedman's application for a first class certificate.

In its October 6, 2015 letter, the FAA first expressly required CGM data from Friedman: the Agency warned it would "deny [his] request for upgrade" to a first class certificate if he did not "reply within 60 days . . . [to] advise [the FAA] of [his] plans" to provide the requested data. JA 72; *see* 14 C.F.R. § 67.413(a) & (b) (noting an applicant "must" provide requested supplemental information and authorizing the FAA to "deny the application for a medical certificate" for those who fail to comply). Friedman refused. Thereafter, on November 13, 2015—about one month after

the FAA's countdown clock started—the FAA repeated its demand, and it requested a "reply within 30 days." JA 55. The Agency was clearly counting down towards a denial on December 13, 2015, and yet Friedman continued to explain that he did not possess or intend to procure the requested CGM data. Then, in its December 1, 2015 letter acknowledging communication from Friedman's attorney, the FAA ignored the ticking clock. Instead, it merely noted, "We are unable to proceed with further determination of your potential eligibility for special issuance of a first-class airman medical certificate until we receive the information previously requested in our letter of November 13, 2015. We look forward to reviewing that information when you are able to provide it." JA 53. Thereafter, in its only communication authored after the thirty-day deadline had passed, the FAA acknowledged Friedman's "request for upgrade[d] first-class special issuance medical certification remains under consideration," but it failed to offer an extension of the previously-set deadline or otherwise establish any timetable for denial of Friedman's application for failure to comply. JA 47 (December 18, 2015 letter).

Here, the FAA has issued no formal decision on Friedman's application for a first class certificate. Despite his consistent refusal to provide the requested CGM data, the Agency has placed Friedman in a holding pattern—preventing him from obtaining any explicitly final determination on his application and thwarting the Court's interest in reviewing those agency actions that, in practical effect if not formal acknowledgement, constitute "the consummation of the agency's decisionmaking process" and determine "rights or obligations." *Bennett*, 520 U.S. at 177–78; *see also* 5 U.S.C. § 551(13) (defining agency "action" to include a "failure to act"). Indeed, this Court has repeatedly noted the applicable test is not whether there are further administrative

proceedings available, but rather "whether the impact of the order is sufficiently 'final' to warrant review in the context of the particular case." *Envtl. Def. Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 591 (D.C. Cir. 1971) (assessing the Federal Insecticide, Fungicide, and Rodenticide Act's provision for judicial review "[i]n a case of actual controversy as to the validity of any order" of the Secretary of Agriculture as articulated in 7 U.S.C. § 135b(d) (1970)); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435–37 (D.C. Cir. 1986) (finding final agency action where a letter from the Environmental Protection Agency confirmed its policy with respect to new labeling changes and noting "[o]nce the agency publicly articulates an unequivocal position . . . and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review"); *Envtl. Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1098–99 (D.C. Cir. 1970).

Where an agency has clearly communicated it will not reach a determination on a petitioner's submission due to petitioner's recalcitrance but simultaneously refuses to deny the petitioner's submission on those grounds, it has engaged in final agency action subject to this Court's review. In *Securitypoint Holdings, Inc. v. Transportation Security Administration*, 769 F.3d 1184 (D.C. Cir. 2014), for example, we reviewed as final agency action a letter from the Transportation Security Agency ("TSA") Chief Counsel refusing to lift a contracting requirement newly imposed on TSA airport security checkpoint contractors. SecurityPoint sought to obtain the government contract, but it objected to and refused to sign TSA's new Memorandum of Understanding ("MOU") promising to indemnify TSA for intellectual property claims. *Id.* at 1186. The company wrote to the TSA's Chief Counsel to urge the agency to abandon the MOU, and TSA denied the request by letter. The Court later

held that letter represented the consummation of the agency's "decisionmaking process regarding SecurityPoint's contention that it should abandon the challenged alterations of the MOU language." *Id.* at 1187. Here, Friedman refuses to comply with the agency requirement he seeks to challenge, and the Agency has made clear it will not act on his application until he submits. Friedman, for his part, repeatedly asserts that he provided all that is required under the April 2015 AME Guide, and no FAA "regulation or policy require[s] the use of [CGM] for either initial certification or inflight monitoring." JA 41–43. Accordingly, as with the TSA Chief Counsel's letter in *SecurityPoint*, the FAA's communications here represent the agency's rejection of Friedman's argument, its final decision to require CGM data, and its confirmation that it is not now opening the third-class applicants' case-by-case exemption process to first-class applicants.

The government, apparently ignoring the power of the Court to ensure justice in an area of law governed by a "pragmatic and flexible" approach, *Rhea Lana*, 824 F.3d at 1027, is content to distinguish the cases cited by Friedman on their specific facts. *Air One Helicopters, Inc. v. FAA*, 86 F.3d 880 (9th Cir. 1996), the Agency contends, applies only to a scenario where an agency and a private party find themselves at an impasse that neither is empowered to clear. Similarly, the FAA reads *Air Line Pilots Ass'n International v. Civil Aeronautics Board*, 750 F.2d 81 (D.C. Cir. 1984), to apply only to situations where the private party has done everything in his power to comply with an agency's request but the agency, nonetheless, excessively delays determination of his claims. Finally, the FAA asserts the doctrine of *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970), reviewing "administrative inaction [that] has precisely the same impact on the rights of the parties as denial of relief," does not apply since Friedman is

free to trigger a new six-month license validity period at his option. The Agency has missed the forest for the trees. Nothing in our case law suggests the law of final agency action is confined to the specific facts of prior circuit cases.

To the contrary, the doctrine asks whether a particular agency action represents the "consummation of [its] decisionmaking process" and determines "rights or obligations." *Bennett*, 520 U.S. at 177–78. The standard is met here. As described above, the FAA has set deadlines, counted down towards them, and then allowed them to pass without discussion; its actions suggest the FAA has made up its mind, yet it seeks to avoid judicial review by holding out a vague prospect of reconsideration. And, as a result of the FAA's conduct, Friedman has been unable to resume his job as a commercial airline pilot at American Airlines, a job that requires a first class medical certificate. *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 598 (D.C. Cir. 2007) (finding adequate legal consequences where an agency's new test for runway lighting "effectively prohibits airports from buying light bases that fail the new . . . test, and . . . bars manufacturers like Safe Extensions from selling their products to airports").

## III.

Since we hold Friedman's case is subject to judicial review, we now proceed to the merits.

The FAA argues Friedman's claims are insulated from judicial scrutiny as "there is no law to apply" to the FAA's determination. *Drake v. FAA*, 291 F.3d 59, 70 (D.C. Cir. 2002); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971). But the jurisprudence of unfettered discretion is inapplicable here. Several regulations provide the criteria upon which the FAS relies to determine

whether Friedman may be granted a first-class certificate. Specifically, under 14 C.F.R. § 67.401(a), a special issuance may be granted "if the person shows to the satisfaction of the Federal Air Surgeon that the duties authorized by the class of medical certificate applied for can be performed without endangering public safety during the period in which the Authorization would be in force." Later in that same section, the regulation charges the FAS with a duty to "consider[] the need to protect the safety of persons and property in other aircraft and on the ground." *Id.* § 67.401(e). While these directives are clearly open to interpretation, they nonetheless provide a judicially manageable standard. *See, e.g.*, *Safe Extensions*, 509 F.3d at 601 (finding a judicially manageable standard in the phrase "necessary for safety" under 49 U.S.C. § 44701); *Union of Concerned Scientists v. U.S. Nuclear Regulatory Comm'n*, 824 F.2d 108, 109, 113 (D.C. Cir. 1987) (reviewing whether regulations "provide[d] adequate protection to the health and safety of the public" under 42 U.S.C. § 2232(a)).

Arguing in the alternative, the FAA maintains Friedman's license application was denied for refusal to comply with the Agency's request for CGM data. To justify this decision, the FAA points to the Expert Panel's letter in support of Friedman's application, which acknowledged "CGM systems have value" and are "most useful in identifying trends and the direction and speed at which a person's blood sugar may be changing." JA 65–66. While the Expert Panel concluded treatment decisions for individuals with ITDM should not be based on CGM data alone—as the devices may be inaccurate and are, in any event, less accurate than fingerstick blood test results—it also noted CGM provides constant glucose monitoring results capable of detecting spikes and dips in interstitial glucose (indicative of actual blood glucose) that might have gone

undetected via intermittent fingerstick measurements. *Ibid*; *see also* ADA Amicus Br. 13–14. Nonetheless, the FAA overstates the usefulness of this concession, as the Expert Panel does not ultimately recommend employing CGM data "for making decisions on medical certification of pilots with diabetes." JA 66. It is not for us to say in the first instance whether or how CGM data might be of future use to the FAA in evaluating license applications. But it is clear the FAA has not borne its burden of justification. The FAA's letters communicating its demand for CGM data to Friedman, despite his many requests for clarification, fail to articulate any rationale for consideration of the additional information. *See Safe Extensions*, 509 F.3d at 606 (finding no "substantial evidence" to support the FAA's rationale where it offered "no evidence whatsoever" on the relevant issue).

Notably, the Agency does not identify *any FAA statements* that could be construed as explaining its denial of Friedman's application, the determination Friedman calls upon this Court to review. Of course, there is a certain irony inherent in requiring an agency to identify reasons for a denial it never thought it issued. But "recent [D.C. Circuit] cases regarding whether agency actions qualify as orders never consider the adequacy of the record, instead asking only whether the action was final." *Id.* at 599 (citing *Dania Beach*, 485 F.3d at 1187; *Vill. of Bensenville v. FAA*, 457 F.3d 52, 68 (D.C. Cir. 2006)). As the Supreme Court explained,

> The focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court. The task of the reviewing court is to apply the appropriate APA standard of review to the agency decision based on the record the agency presents to the reviewing

> court. If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). Specifically, "the court can undertake review as though the agency had denied the requested relief and can order an agency to either act or provide a reasoned explanation for its failure to act." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987).

In light of the complete absence of a relevant administrative record to review—and the inherent inequity in passing judgment on this matter without offering the Agency a chance to explain its reasoning—any analysis of the FAA's denial would be imprudent. Accordingly, we remand this matter to the FAA to offer reasons for its denial of Friedman's application for a first class medical certificate. Friedman's additional allegations must await proceedings on remand.

15

***

The FAA has placed Friedman in administrative limbo—he has neither a first class medical certificate nor an official order denying him the certificate—and the only way out requires capitulation to the very requirement he seeks to challenge. The Agency cannot manipulate its own processes, threatening denial but then refusing to deny or otherwise take definitive action on Friedman's application, in an effort to thwart judicial review.

*So ordered.*