# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued January 11, 2018       Decided March 27, 2018
Reissued July 20, 2018

No. 15-1285

CITIZENS ASSOCIATION OF GEORGETOWN, ET AL.,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION AND MICHAEL P.
HUERTA, ADMINISTRATOR, FEDERAL AVIATION
ADMINISTRATION,
RESPONDENTS

———

On Petition for Review of an Order
of the Federal Aviation Administration

———

*Matthew G. Adams* argued the cause for petitioners. With him on the briefs were *Richard deC. Hinds*, *Don W. Crockett*, *Kenneth Pfaehler*, and *Peter L. Gray*.

*Lane N. McFadden*, Attorney, U.S. Department of Justice, argued the cause for federal respondents. With him on the brief were *Jeffrey H. Wood*, Acting Assistant Attorney General, and *David C. Shilton*, Attorney.

Before: HENDERSON and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: For decades, airplanes departing from Ronald Reagan Washington National Airport ("National") followed a route that took them over northern Virginia and the west bank of the Potomac River. In December 2013, after studying proposed route changes and finding that they would have no significant environmental impact, the Federal Aviation Administration (FAA) approved new flight paths that would bring planes closer to the Georgetown neighborhood of Washington, D.C. In the following months, pilots occasionally departed from National along the new routes. In June 2015, after conducting additional flight trials, the FAA published charts depicting the approved routes in a catalog the agency maintains of approved departure and approach procedures. Georgetown University and six local neighborhood associations then petitioned for review, alleging that the FAA failed to comply with environmental and historic preservation laws when assessing the noise impacts of the new departure procedures. Unfortunately for petitioners, they filed their challenge too late. Federal law requires that petitions seeking review of FAA actions be filed within sixty days of the agency's final order unless the petitioner had "reasonable grounds" for delay. 49 U.S.C. § 46110(a). In this case, because the FAA's December 2013 approval of the new routes, not its later publication of the route charts, qualifies as the agency's final action, and because petitioners failed to challenge it within the sixty-day statutory time limit and had no "reasonable grounds" for the delay, we dismiss the petition as untimely.

## I.

National Airport, described by President Franklin D. Roosevelt as "one of the world's greatest facilities, surely its most convenient and, some of us like to think, probably its most beautiful," has served the Washington, D.C. metropolitan area

for more than seventy-five years. President Franklin D. Roosevelt, *Remarks of the President Delivered in Connection with the Laying of the Cornerstone of the Administration Building at the Washington National Airport* (Sept. 28, 1940). Despite the dramatic growth of air traffic at National—from 350,000 passengers in its first year to 24 million in 2017 with some 550 daily takeoffs, Metropolitan Washington Airport Authority, *Air Traffic Statistics December 2017* at 2, 4 (2017)—departure procedures remained largely constant for much of the airport's history. Until recently, pilots would typically follow a departure procedure known as "NATIONAL" when the airport was in "north flow operation"—*i.e.*, when planes were landing at the southern end and departing at the northern end. This procedure directed pilots to take off in a northwest direction and follow the 328-degree radial out of the airport. For readers following along with a map and compass, this would bring airplanes over Arlington National Cemetery, Rosslyn, and along the west bank of the Potomac River until just past the Georgetown Reservoir.

The actual path pilots flew, however, was not quite a straight line. Rather, a noise-abatement procedure designed to divert aircraft over the river and reduce flying time above more populated areas instructed pilots to take off in a northern direction and "[f]ollow the Potomac River until abeam the Georgetown reservoir," at which point they were to join the "[National] 328 radial." FAA, Terminal Procedures Publication 363 (Feb. 11, 2010), Joint Appendix (J.A.) 553. As shown in Figure 1, which depicts departure flight paths from radar data recorded in 2002, aircraft departing according to

4

NATIONAL would fly a curved route that roughly followed the course of the Potomac River just south of Georgetown.



**Figure 1** (J.A. 588)

In the early 2000s, the FAA, acting pursuant to its authority under the Federal Aviation Act of 1958, 49 U.S.C. §§ 40101 *et seq.*, to prescribe air-traffic procedures governing

how and where planes fly, as "necessary to ensure the safety of aircraft and the efficient use of airspace," *id.* § 40103(b)(1), began an effort to update flight paths around National. The agency convened a working group made up of the Metropolitan Washington Airports Authority (MWAA)—an independent agency that manages National and Washington Dulles International Airport—other federal agencies, local elected representatives, and citizens to develop ideas for further reducing noise and increasing safety at National. This group recommended that the FAA "encourage the use of advanced navigation technology by airlines . . . to follow more predictable and precise flight tracks along the center of the Potomac." MWAA, FAR Part 150 Noise Exposure Maps and Noise Compatibility Program VI-3 (Nov. 22, 2004), J.A. 58. In response, the FAA began developing a procedure for "performance-based navigation," also referred to variously as "RNAV procedures" or area navigation procedures. Unlike conventional departure procedures, such as NATIONAL, which rely on a mix of radar tracking and analog navigation instructions from air-traffic control, RNAV procedures utilize satellite navigation technology to more accurately and flexibly guide aircraft.

The FAA's efforts culminated in a new departure procedure for National known as "LAZIR." This RNAV procedure guided north-bound departures from National roughly along the same route set out in the conventional NATIONAL procedure, except that it took advantage of Global Positioning System technology to guide aircraft. As the FAA was implementing LAZIR at National in 2011, Congress enacted legislation that directed the agency "to modernize the nation's air-traffic control system." *City of Phoenix v. Huerta*, 869 F.3d 963, 966 (D.C. Cir. 2017), *opinion amended on reh'g*, 881 F.3d 932 (D.C. Cir. 2018) (citing FAA Modernization and Reform Act of 2012, Pub. L. No. 112-95, §§ 101(a),

213(a)(1)(A), 126 Stat. 11, 47). Spurred by this new legislation, the FAA developed the Washington, D.C., Optimization of the Airspace and Procedures in the Metroplex (D.C. Metroplex)—a package of 41 new and modified flight procedures to guide arrivals and departures at National, as well as at Washington Dulles International Airport and Baltimore/Washington International Thurgood Marshall Airport. Central to the issues before us, the D.C. Metroplex established several new north-bound departure procedures from National that began identically to the LAZIR procedure and then, once past the Potomac River, branched out in various directions depending on the aircraft's ultimate destination.

When exercising its authority to promulgate new departure procedures, *see* 49 U.S.C. § 40103(b)(1), the FAA must comply with a constellation of statutory and regulatory schemes designed to ensure that federal agencies properly account for their contemplated actions. *See Environmental Impacts: Policies and Procedures*, FAA Order 1050.1E § 401 (June 8, 2004). One such scheme, established by the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4370m, requires agencies to prepare an environmental impact statement (EIS) for "every . . . major Federal action[] significantly affecting the quality of the human environment," *id.* § 4332(C). If uncertain about whether the contemplated action requires a full EIS, the agency must at least prepare an "'environmental assessment' [(EA)] to determine whether the action will cause a 'significant' environmental impact," such as by substantially increasing noise levels. *City of Dania Beach, Fla. v. FAA*, 485 F.3d 1181, 1189 (D.C. Cir. 2007) (citing 40 C.F.R. § 1508.9(a)). If "the agency determines that a full EIS is not required, it must still issue a 'finding of no significant impact' [(FONSI)] explaining why the project is unlikely to have a significant effect on the environment." *Id.* (citing 40 C.F.R. § 1508.13).

Pursuant to NEPA, the FAA conducted an environmental analysis of the D.C. Metroplex, which it initiated by distributing a notice of intent to prepare a draft EA in December 2012. Although the FAA sent the notice directly to 330 parties, only two were officials of the District of Columbia: the State Historic Preservation Officer and Congresswoman Eleanor Holmes Norton. The FAA also published notice in area newspapers, including the *Washington Post*, and offered to host public workshops—though none was requested.

In June 2013, the FAA issued a draft EA for the D.C. Metroplex. In order to analyze the environmental impact of the new LAZIR procedures, the agency relied on a computer model that, among other things, compared a scenario where no aircraft flew LAZIR with one where the majority of aircraft did so. According to that model, no neighborhood in the Washington, D.C. area was expected to experience a "reportable noise increase," which under FAA Order 1050.1E meant noise that, though not itself significant under NEPA, warranted further investigation. The FAA distributed the draft EA to some 450 recipients—again, only two of whom were officials in the District—and opened a notice and comment period, which it publicized in local newspapers.

After reviewing comments on the draft EA, the FAA prepared a Finding of No Significant Impact and Record of Decision ("FONSI/ROD"), which formalized its determination that the D.C. Metroplex would "not significantly affect the quality of [the] human environment." FAA, Finding of No Significant Impact (FONSI) and Record of Decision (ROD) for the Washington D.C. Optimization of the Airspace and Procedures in the Metroplex (DC OAPM) 17 (Dec. 2013) ("FONSI/ROD"), J.A. 1485, 1505. Published in December 2013, the FONSI/ROD stated that it "constitutes a final order of the FAA Administrator and is subject to . . . judicial review

under 49 U.S.C. § 46110." *Id.* at 18, J.A. 1506. The FAA sent the FONSI/ROD to the same distribution list as the draft EA, published notice in area newspapers, and made the document available on the internet.

Although the FAA approved the D.C. Metroplex in December 2013, pilots used the new LAZIR-based departure procedures only occasionally during the following year. Their hesitancy stemmed from the worry that LAZIR, designed to encourage pilots to fly over the center of the Potomac River, would bring them closer to a patch of restricted airspace known as "Prohibited Area 56" ("P-56"), which includes the skies over the National Mall, the White House, and the U.S. Capitol. Pilots who fly into P-56 without Secret Service authorization can be fined.

To address the pilots' concern, the FAA conducted a series of trial validation activities in March 2015 aimed at determining whether pilots could utilize the D.C. Metroplex LAZIR procedures without veering into P-56. During this period, the agency actively encouraged pilots to fly LAZIR and, with the Secret Service's consent, guaranteed that they would incur no penalties for straying into P-56. After successfully completing the trials, the FAA, in April and June 2015, published charts depicting the LAZIR-based routes in the *Terminal Procedures Publication*—a catalog of airport diagrams and procedures the agency issues every fifty-six days. Although some route names changed and a few technical modifications were made, the routes published in 2015 were identical to those evaluated in the 2013 FONSI/ROD.

Petitioners Georgetown University and six neighborhood associations located in Northwest D.C. (collectively, "Georgetown") are concerned about increased noise from air traffic out of National. In October 2013, approximately four

months after the FAA published the draft EA, Georgetown's Councilmember Jack Evans first inquired about the issue in a letter to the MWAA. In response, the MWAA informed Mr. Evans that no flight paths had changed since at least 2008. For the next year and a half, Georgetown continued pursuing the airplane noise issue in several meetings with MWAA and FAA officials. During this entire period, Georgetown claims that notwithstanding multiple notices regarding the D.C. Metroplex in the *Washington Post*, it was completely unaware of the project and the recently completed EA process. Not until it met with the FAA in July 2015 did Georgetown learn of the LAZIR-based departure procedures. Pet'rs' Br. 17. Then, on August 24, 2015—approximately eighteen months after the FONSI/ROD was issued and pilots began flying the LAZIR procedures—Georgetown filed a petition for review in this court challenging the FAA's approval of the LAZIR-based departure procedures, in which it alleged that the agency failed to comply with NEPA and several other statutes.

## II.

Federal courts may review decisions of the Secretary of Transportation, including FAA orders, pursuant to 49 U.S.C. § 46110. This provision sets forth how petitions for review are processed, what remedial authority courts possess when adjudicating such petitions, and—critically for our purposes—when petitions for review must be filed. *See id.* Under section 46110(a), any person seeking review of "an order issued by the Secretary of Transportation" must file a petition "not later than 60 days after the order is issued." *Id.* § 46110(a). That section further provides that "[t]he court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day." *Id.*

The threshold issue in this case is whether Georgetown filed its petition for review within sixty days of when the FAA

issued a final order approving LAZIR-based departure procedures or, if not, whether it had "reasonable grounds" for missing the deadline. The FAA argues that the petition is untimely because Georgetown filed it more than a year and a half after the December 2013 publication of the FONSI/ROD, which, according to the agency, qualified as the final order approving the LAZIR procedures. For its part, Georgetown argues that its petition is timely because the FAA's decision became final only when the agency published charts depicting the LAZIR procedures in the *Terminal Procedures Publication* in June 2015. Alternatively, Georgetown insists, it had "reasonable grounds" for its delayed filing.

## A.

To determine when the FAA issued its final order, we follow the Supreme Court's well-established two-part test for assessing finality. First, to qualify as final, an order must "'mark the consummation of the agency's decisionmaking process,'" *Friedman v. FAA*, 841 F.3d 537, 541 (D.C. Cir. 2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)); and second, it must "either determine[] 'rights or obligations' or [be] a source of 'legal consequences,'" *City of Phoenix*, 869 F.3d at 968 (quoting *Friedman*, 841 F.3d at 541).

To apply the first part of the test—whether an order constitutes the "consummation of [the] decisionmaking process"—we ask "not whether there are further administrative proceedings available, but rather 'whether the impact of the order is sufficiently "final" to warrant review in the context of the particular case.'" *Friedman*, 841 F.3d at 542 (quoting *Environmental Defense Fund, Inc. v. Ruckelshaus*, 439 F.2d 584, 591 (D.C. Cir. 1971)). In this case, that means we must determine when the "impact" of the LAZIR-based departure procedures was sufficiently final for us to review

Georgetown's claim that the FAA approved those routes without complying with applicable environmental regulations.

Resolution of this issue is controlled by our court's recent decision in *City of Phoenix v. Huerta*, 869 F.3d 963. That case concerned the FAA's effort to develop next-generation flight procedures, much like those at issue here, for Phoenix's Sky Harbor International Airport. After evaluating the environmental impact of the proposed routes, the FAA published them and put them into immediate use in September 2014. Following swift public outcry, the FAA suspended the new routes and began a dialogue with the city of Phoenix about developing alternative departure procedures. In April 2015, after several months of back-and-forth and having convened a working group to study the issue, the FAA issued a final report, which, although making a few adjustments, "reaffirmed the agency's decision not to conduct further review of the new flight paths' environmental impact." *Id.* at 968. In June 2015, Phoenix filed a section 46110 petition for review in this court, which the FAA sought to dismiss as untimely for having been filed more than sixty days—indeed, more than nine months—after the original publication of the routes.

As in this case, the crucial question in *City of Phoenix* was when did the FAA issue its final order as to the disputed routes? According to the FAA, its decisionmaking consummated in September 2014 when it initially published the routes. *Id.* at 968–69. For its part, Phoenix argued that the FAA's decision became final only after the distribution of the April 2015 report. Siding with the FAA, the court explained that the agency's decisionmaking concluded with the initial publication when "the new routes [went] into effect following extensive testing and evaluation." *Id.* at 969.

Several aspects of the decisionmaking process in this case make clear that the FAA's final order was the 2013 publication of the FONSI/ROD. First, as in *City of Phoenix*, the FONSI/ROD represented the culmination of an extensive decisionmaking process concerning the environmental impact of LAZIR-based departure procedures. From the initial notice of intent to prepare a draft EA, published in December 2012, the FAA spent more than a year conducting environmental analyses, soliciting comments from regional stakeholders, preparing draft EAs and supplementary technical reports, conducting notice and comment, and eventually publishing a full record of decision. Second, any deficiency in complying with the requirements of NEPA and other relevant statutes would have occurred during that period, *see Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (NEPA "simply prescribes the necessary process"), and any procedural claim would have ripened upon publication of the FONSI/ROD, *see City of Dania Beach*, 485 F.3d at 1187–90 (holding that "the FAA's failure to follow the proper review procedures before authorizing" the use of certain runways was reviewable upon dissemination of the decision). Indeed, though not dispositive of the legal question before us, the FAA signaled its belief that the FONSI/ROD was the consummation of its decisionmaking when it concluded the document by alerting readers that it "constitutes a final order of the FAA Administrator and is subject to . . . judicial review under 49 U.S.C. § 46110." FONSI/ROD 18, J.A. 1506. And third, the record contains no evidence that the FAA either conducted, or intended to conduct, any further environmental analysis of LAZIR subsequent to the December 2013 publication of the FONSI/ROD. Rather, as in *City of Phoenix*, pilots began departing according to these procedures, though infrequently, immediately after publication.

Although acknowledging that the FAA completed its NEPA analysis with the December 2013 publication, Georgetown nonetheless contends that the FONSI/ROD cannot qualify as a final order for two reasons. Neither is persuasive.

First, Georgetown invokes FAA Order 7100.41, *Performance-Based Navigation Implementation Process*, which outlines a five-step process for designing and implementing new routes. According to this rubric, the preparation of a draft EA takes place during step two while route publication and implementation occurs at step four. Although nothing in FAA Order 7100.41 specifies the step at which "the FAA's decision regarding the new flight routes crystallize[s] into final agency action," *City of Phoenix*, 869 F.3d at 968, Georgetown argues that an action becomes final only at step four, which, according to Georgetown, did not occur until June 2015 when the agency published the route charts. We have no need to parse the intricacies of FAA Order 7100.41 for a simple reason: the order did not take effect until April 3, 2014—years after the D.C. Metroplex was initially conceived and months after the FONSI/ROD was published—and contains no indication that it applied retroactively. Thus, there is no reason to expect the EA process for the D.C. Metroplex to have conformed to the timeline set out in Order 7100.41 nor to think that the order somehow displaces this court's ordinary finality inquiry.

Second, Georgetown argues that because the FAA conducted additional validation trials of LAZIR in March 2015, the agency could not have "consummated" its decisionmaking until it published the route charts in June 2015. This court rejected a nearly identical argument in *City of Phoenix*. In that case, even though the FAA had suspended the new departure procedures and expressly agreed to reevaluate their environmental effects and even though this post-

implementation review "might [have led] to adjustments," the court concluded that the agency had consummated its decisionmaking with the initial publication because "the primary development of those routes ha[d] already happened." *City of Phoenix*, 869 F.3d at 969 (citing *Friedman*, 841 F.3d at 543 (explaining that "a vague prospect of reconsideration" does not defeat a finding of finality)). In this case, the FAA's post-implementation validation activities were far more limited. The FAA neither suspended the new procedures nor even hinted that it would reconsider their environmental impact. Rather, pilots have flown LAZIR continuously since the publication of the FONSI/ROD, and the only post-implementation review pertained to whether aircraft could follow LAZIR without intruding into P-56. So, if the FAA's post-implementation activity in *City of Phoenix* was insufficient to alter the court's finality determination, then surely its far less robust post-implementation review in this case provides no basis for altering our conclusion that the FAA consummated its decisionmaking process regarding LAZIR when it published the 2013 FONSI/ROD. It was then that "the primary development of th[e] routes" occurred. *Id.*

The other element of the finality inquiry—whether the agency's order determined "rights or obligations" or was the source of "legal consequences," *Friedman*, 841 F.3d at 541 (internal quotation marks omitted)—is likewise largely controlled by *City of Phoenix*. To decide whether this element was satisfied, the court asked which document—the initial publication of new routes or the subsequent reaffirmance—"led to the effects petitioners [sought] to reverse: increased noise in certain areas of Phoenix." *City of Phoenix*, 869 F.3d at 969. According to the court, it was the former because it was that document that led to the utilization of next-generation procedures and the resulting increased noise; in fact, it was the very document petitioners sought to vacate. *Id.*

So too here. It was the FONSI/ROD, which completed the environmental analysis and enabled pilots to depart according to LAZIR-based procedures, that caused the alleged legal injury: the FAA's failure to adequately analyze the impact of LAZIR and the increased aircraft noise over Georgetown. Further, it is the FONSI/ROD that we would have to vacate to afford relief. Indeed, as Georgetown makes clear in its petition, it seeks review of the FAA's decision to "permanently implement certain flight arrival and departure routes at [National] *in violation of [NEPA]*." Pet. for Review 1 (emphasis added). Put simply, Georgetown's claims accrued during the EA process and crystallized with the publication of the FONSI/ROD. By contrast, the 2015 chart publication had no relation to the EA process, and vacating those charts would give Georgetown none of the relief it seeks since—as is evident from the fact that pilots were flying LAZIR 2014—they were not a prerequisite to flying the routes.

Georgetown argues that even if the 2013 FONSI/ROD was the source of certain legal consequences, additional "real-world" consequences flowed from the 2015 chart publication. According to Georgetown, the publication had the effect of "rendering LAZIR the default path for all RNAV-equipped aircraft departing north from National," Pet'rs' Br. 16, thus making it too a "final and reviewable [order] within the meaning of 49 U.S.C. § 46110(a)," Reply Br. 3. In support, Georgetown cites our court's decision in *City of Dania Beach*, 485 F.3d 1181, which explains that agency action that establishes "new marching orders about how air traffic will be managed" can constitute a final order, *id.* at 1188.

Although at first glance Georgetown's argument has some appeal, it runs into both procedural and substantive obstacles. To begin with, Georgetown first raised the argument in its reply brief, and this court ordinarily deems such

arguments forfeited. *See Rollins Environmental Services v. EPA,* 937 F.2d 649, 652 n.2 (D.C. Cir. 1991). To be sure, Georgetown did assert in the facts section of its opening brief that the 2015 chart publication rendered LAZIR the default departure procedure for National. Pet'rs' Br. 16. But as we have made clear, "explaining the factual basis in the opening brief for an argument not made until the reply brief is insufficient to raise the claim." *See American Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008).

In any event, Georgetown has identified no record evidence for its claim that printing route charts in the *Terminal Procedures Publication* actually rendered LAZIR the default departure procedure. Quite to the contrary, the evidence indicates that the transition to LAZIR was set in motion by the FAA's efforts to implement the working group's suggestions and flowed directly from the agency's December 2013 approval of the D.C. Metroplex. *See supra* at 4–8. Unlike in *City of Dania Beach*, the 2015 publication of route charts established no "new marching orders." 485 F.3d at 1188.

The December 2013 publication of the FONSI/ROD satisfied both elements of this court's finality test: it "mark[ed] the consummation of the agency's decisionmaking process and . . . [was] a source of legal consequences." *City of Phoenix*, 869 F.3d at 968 (internal quotation marks omitted). By contrast, the 2015 chart publication satisfied neither requirement. Accordingly, Georgetown's effort to seek judicial review comes too late unless it had "reasonable grounds" for its untimely filing—an issue to which we now turn.

**B.**

This court "rarely [finds] 'reasonable grounds' under section 46110(a)." *Electronic Privacy Information Center v. FAA*, 821 F.3d 39, 43 (D.C. Cir. 2016). After analyzing the few

cases in which the exception was allowed, the court in *City of Phoenix* observed that in all such cases the agency "left parties 'with the impression that [it] would address their concerns'" without needing to resort to litigation. 869 F.3d at 970 (alteration in original) (quoting *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 596 (D.C. Cir. 2007)). In that case, for instance, the court found that the back-and-forth discussions between the city and the FAA "would certainly have led reasonable observers to think the FAA might fix the noise problem without being forced to do so by a court." *Id.* Given this impression, the court concluded, petitioners had reasonable grounds for delaying their filing and should not be "punish[ed] . . . for treating litigation as a last rather than a first resort." *Id.*

Unlike petitioners in *City of Phoenix*, Georgetown does not argue that it delayed filing its petition for review because the FAA led it "to think the [agency] might fix the noise problem without being forced to do so by a court." *Id.* After all, by its own admission, it "first learned" of the D.C. Metroplex in July 2015, a year and a half after the FAA approved it. Pet'rs' Br. 17. Instead, Georgetown argues that the FAA's actions were misleading in a different way, namely by failing to inform Georgetown of the ongoing EA and, later, the publication of the FONSI/ROD. This, Georgetown insists, amounts to "reasonable grounds for not filing by the 60th day." 49 U.S.C. § 46110(a).

In support, Georgetown first faults the FAA for sending actual notice of the EA process to only two officials connected to Washington, D.C.—the State Historic Preservation Officer and the city's delegate to Congress—despite sending such notice to more than 300 officials outside the District. At oral argument, FAA counsel explained that this troublingly imbalanced notice resulted not from any intentional effort to exclude Washington, D.C. from the EA process, but rather

from "an oversight by the contractor." Oral Arg. 27:26–50. Were the FAA obligated to give actual notice to all interested public officials, this explanation—little more than "an updated version of the classic 'my dog ate my homework' line"—would be entirely unacceptable. *Fox v. American Airlines, Inc.*, 389 F.3d 1291, 1294 (D.C. Cir. 2004) (rejecting an argument that a computer malfunction excused counsel's obligation to file a timely response to a motion). Georgetown's argument nonetheless fails.

For one thing, our cases make clear that lack of "actual notice" neither "delay[s] the start of the sixty-day filing period" nor provides reasonable grounds for a petitioner's failure to timely file for review under section 46110. *Avia Dynamics, Inc. v. FAA*, 641 F.3d 515, 520 (D.C. Cir. 2011). Rather, the clock starts ticking from "the date the order is officially made public." *Id.* at 519. Of course, this is not to say that the FAA has no duty to inform the public of an ongoing EA process or to make the final order public in an appropriate manner. But that leads to the second point: the administrative record in this case demonstrates that the FAA in fact satisfied its notice obligations through "[p]ublication in local newspapers." 40 C.F.R. § 1506.6(b)(3)(iv). Although no court has ruled on the adequacy of such notice under NEPA, the Supreme Court has made clear that this sort of publication suffices in similar circumstances. *See Costle v. Pacific Legal Foundation*, 445 U.S. 198 (1980) (holding that EPA had complied with its notice obligations as to a sewage discharge plan by publishing notice in the *Los Angeles Times*). In this case, the FAA complied with its obligation by publishing notice in both the *Washington Post* and the *Baltimore Sun*.

Georgetown next argues that even if the FAA met the letter of its notice obligation, it still had reasonable grounds for its delayed filing because the agency "collaborated with MWAA

to withhold information about LAZIR from Petitioners and their elected District of Columbia representative." Pet'rs' Br. 25. The evidence on which Georgetown relies, however, provides no support for this claim.

Georgetown first cites an exchange of letters between Councilmember Evans and the MWAA in the fall of 2013. In his letter to the MWAA, Mr. Evans stated that "[i]t ha[d] come to [his] attention that the air traffic pattern at Reagan National Airport ha[d] changed" and requested that the FAA revert to the old routes. Letter from Jack Evans, Councilmember, Washington, D.C., to Michael A. Curto, Chairman, MWAA (Oct. 9, 2013), J.A. 1482. Although the MWAA's response—that no flight paths had changed since August 2008—turned out to be wrong, that error cannot be charged to the FAA because the two are independent bodies with no members in common. As proof that the two agencies coordinated their response, Georgetown points out that the MWAA admitted in its letter that it "contacted the FAA Traffic Control Tower for Reagan National." Letter from John E. Potter, President, MWAA, to Jack Evans, Councilmember, Washington, D.C. (Nov. 14, 2013), J.A. 1483. This offhand reference, however, is far too thin a reed to demonstrate that these two independent bodies collaborated on anything, much less an effort to hide the development of the D.C. Metroplex from the residents of Georgetown.

Next, Georgetown points to several meetings (from March 2014 to July 2015) between representatives from the various affected neighborhood associations and agency officials during which the FAA said nothing about the project. Acknowledging the meetings, the FAA explains that it never mentioned the FONSI/ROD because it assumed that the complaints about ongoing air traffic noise were unrelated to LAZIR, which, during that time, accounted for fewer than 4% of departures.

One might well wonder whether this was a reasonable assumption or whether the better approach would have been to disclose that even more changes were on the horizon. But prudence aside, this fact alone does not provide "reasonable grounds" for Georgetown's delay, especially when the agency had repeatedly published notice about the project in the region's paper of record and on the agency's website.

To sum up, then, given that the FAA, in conformity with its regulations, published notice of the FONSI/ROD in a variety of public domains, including one of the most-widely read publications in the Washington area, and given that the record contains no indication that the FAA intentionally obscured the issuance of a final order, we have no basis for concluding that this is one of those "rare cases" in which reasonable grounds excuse the failure to timely file a petition for review.

### III.

The FAA's efforts to inform the residents of Georgetown about the evaluation of the D.C. Metroplex were hardly a model of sound agency practice. But neither the FAA's stumbles nor those of its contractor excuse Georgetown's failure to timely file a petition for review given that the agency provided adequate notice of the EA process and never indicated that it might change its position. Filing deadlines, replete throughout the United States Code, promote prompt and final judicial review of agency decisions and ensure that agencies and affected parties can proceed free from the uncertainty that an action may be undone at any time. The petition for review is dismissed.

*So ordered.*