# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 16, 2018   Decided May 25, 2018

No. 17-1043

ERIC FRIEDMAN,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

On Petition for Review of an Order
of the Federal Aviation Administration

*Z.W. Julius Chen* argued the cause for petitioner. With him on the briefs was *Gregory S. Walden. Pratik A. Shah* entered an appearance.

*Peter G. Dickos* and *Allison Jones Rushing* were on the brief for *amicus curiae* American Diabetes Association in support of petitioner.

*Casey E. Gardner*, Attorney, Federal Aviation Administration, argued the cause and filed the brief for respondent.

Before: HENDERSON and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: For the second time, Eric Friedman, a type-one diabetic and aspiring commercial pilot, challenges the Federal Aviation Administration's refusal to grant him a medical certificate required for commercial flight. Because Friedman uses insulin to manage his blood sugar, the FAA required him to submit data from a relatively new method of blood-glucose testing known as continuous glucose monitoring (CGM), which Friedman declined to provide. In a prior decision, our court held that the FAA "ha[d] not borne its burden of justification" for requiring CGM data. *Friedman v. FAA* (*Friedman I*), 841 F.3d 537, 544 (D.C. Cir. 2016). On remand, the FAA explained that it needed the data because CGM is able to detect hypoglycemic episodes often missed by more traditional monitoring, and it supported that explanation with medical studies in the administrative record. Because that explanation satisfies our remand order, we deny the petition for review.

**I.**

The opinion in *Friedman I* describes the background of this case. *Friedman I*, 841 F.3d at 539–41. Here, we provide a brief summary and then describe the FAA's actions on remand.

Congress has directed the FAA to promulgate regulations that "promote safe flight of civil aircraft," 49 U.S.C. § 44701(a), and to discharge this obligation "in a way that best tends to reduce or eliminate . . . accidents in air transportation," *id.* § 44701(c). Specifically, Congress has instructed the FAA to ensure that pilots are "physically able to perform the duties related to[] [their] position." *Id.* § 44703(a). To implement this directive, the FAA requires pilots to hold medical certificates of one of three classes: pilots who fly commercial airliners

must have first-class medical certificates, 14 C.F.R. § 61.23(a)(1), pilots who otherwise fly commercially must have second-class certificates, *id.* § 61.23(a)(2), and pilots who fly privately must have third-class certificates, *id.* § 61.23(a)(3). In keeping with Congress's instruction that the FAA consider "the duty of [a commercial] air carrier to provide service with the highest possible degree of safety in the public interest," 49 U.S.C. § 44701(d)(1), the Federal Air Surgeon, to whom the FAA Administrator has delegated his medical certification authority, 14 C.F.R. § 67.407, has adopted more rigorous medical standards for pilots who fly commercially (first- and second-class) than for those who fly privately (third-class), *see id.* §§ 61.23(a), 67.101–67.315.

Under FAA regulations, some medical conditions, including diabetes treated with insulin, are presumptively disqualifying for any class of medical certificate. *Id.* §§ 67.113(a) (first-class), 67.213(a) (second-class), 67.313(a) (third-class). The primary danger of flying with insulin-treated diabetes, the FAA has explained, is the risk of hypoglycemia, a state of abnormally low blood-glucose levels, which is common among diabetics, especially those who use insulin, and which can impair a range of cognitive functions, including reaction time, memory, problem solving, and spatial reasoning. Special Issuance of Third-Class Airman Medical Certificates to Insulin-Treated Diabetic Airman Applicants, 61 Fed. Reg. 59,282, 59,282 (Nov. 21, 1996) (explaining that the FAA's disqualification policy was based in large part on concerns about hypoglycemia).

Notwithstanding this presumptive disqualification, FAA regulations provide that, "[a]t the discretion of the Federal Air Surgeon," the agency may grant a "Special Issuance" medical certificate to any applicant who shows an ability to safely perform all authorized duties "to the satisfaction of the . . . Air

Surgeon." 14 C.F.R. § 67.401(a). Pursuant to this authority, the Air Surgeon has awarded special-issuance third-class medical certificates to some insulin-treated diabetics—a practice that has led to "no medically related accident, incident, or inflight incapacitation, from any cause." *Friedman I*, 841 F.3d at 540.

Although the Air Surgeon has never granted a special-issuance first- or second-class medical certificate to an insulin-treated diabetic, the FAA announced in 2013 that it "hope[d] that in the future [it] may be able to . . . safely certificate . . . a subset of [insulin-treated diabetics]" at the first- and second-class level, and asked the American Diabetes Association (ADA) to form an expert panel "to investigate the possibility of identifying" such diabetics. Letter from Michael P. Huerta, Administrator, FAA, to Robert Ratner, Chief Scientific & Medical Officer, ADA (July 15, 2013), Joint Appendix (J.A) 416. In its report, the panel recommended a protocol for identifying low-risk insulin-treated diabetics and concluded that for such pilots "there is no incremental risk of permitting [them] to fly." ADA, *Expert Panel Recommendations for Pilots with Insulin-Treated Diabetes* 6 (2015), J.A. 368.

The FAA declined to adopt the recommended protocol, explaining that it found the panel's recommendations lacking in "evidentiary support" and neither "operationally feasible" nor sensitive to commercial pilots' "real-world challenges." Letter from James R. Fraser, Federal Air Surgeon, FAA, to Robert Ratner, Chief Scientific & Medical Officer, ADA (Apr. 9, 2015), J.A. 447. The FAA also believed that the panel's protocol was too lax, as it would have allowed certification of pilots with blood-glucose levels "outside the normal glycemic range at least 20 percent of the time." *Id.* Despite declining to adopt this (or any) protocol for special issuance of first- or second-class medical certificates to insulin-treated diabetics, the FAA emphasized that it did not have a "blanket ban,"

stating it was open to issuing certificates on an ad hoc basis. Letter from James R. Fraser, Federal Air Surgeon, FAA, to Eric Friedman (Mar. 9, 2015), J.A. 361.

In April 2015, Petitioner, Eric Friedman, an insulin-treated diabetic who currently holds a special-issuance third-class medical certificate, applied to upgrade his certificate to first class. After receiving Friedman's application, the FAA requested blood-glucose testing results either from finger-stick testing, which involves pricking a finger and using a glucometer to test extracted blood, or "if applicable," from CGM, a newer and less commonly used method of blood-glucose testing that measures glucose levels continuously using a subcutaneously inserted sensor and a small, wearable device. Letter from James R. De Voll, Medical Appeals Manager, FAA, to Eric Friedman (Apr. 30, 2015), J.A. 73.

In response, Friedman provided only finger-stick data, explaining that he does not use CGM. Over the next several months, the FAA again suggested—and later demanded—that Friedman provide CGM data for a minimum of 90 days, eventually warning that failure to do so would result in denial of his application. Friedman reiterated that he does not use a CGM device "because neither of [his] treating physicians . . . has found . . . [the device] is clinically indicated or medically necessary." Letter from Eric Friedman to James R. De Voll, Medical Appeals Manager, FAA (Nov. 6, 2015), J.A. 42. Friedman also pointed out that the ADA expert panel had recommended against CGM's use due to its tendency to "record transient postprandial spikes in glucose levels," which are "of no clinical significance." ADA, *Expert Panel Recommendations for Pilots with Insulin-Treated Diabetes* 7 n.ii, J.A. 369. The panel itself wrote in support of Friedman's application, stating that although CGM is "useful in identifying trends" in blood-glucose levels, it is less accurate than finger-

stick monitoring and thus neither necessary nor appropriate for medical certification decisions. Letter from Daniel Lorber, on behalf of ADA Expert Panel, to James Fraser, Federal Air Surgeon, FAA (Nov. 6, 2015), J.A. 65–66. Unconvinced, the FAA informed Friedman that it was "unable to proceed with" his application "until [it] receive[d] the information previously requested." Letter from James R. De Voll, Medical Appeals Manager, FAA, to Eric Friedman (Dec. 1, 2015), J.A. 53.

Friedman then filed a petition for review in this court, in which he claimed that the FAA's denial violated the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and the Pilot's Bill of Rights, Pub. L. No. 112-153, 126 Stat. 1159 (2012) (codified at 49 U.S.C. § 44703 note). Our court granted the petition, explaining that "[t]he FAA's letters communicating its demand for CGM data to Friedman . . . fail[ed] to articulate any rationale for consideration of the additional information." *Friedman I*, 841 F.3d at 544. Although, in its brief before the court, the FAA relied on the expert panel's acknowledgment of CGM's value, we found this argument unconvincing given the panel's unequivocal opposition to the use of CGM for medical-certification decisions. *Id.* The agency, we emphasized, was unable to "identify *any FAA statements* that could be construed as explaining its denial of Friedman's application." *Id.* at 545. Because the FAA had "not borne its burden of justification," *id.* at 544, we remanded for it to "offer reasons for its denial of Friedman's application," *id.* at 545.

Two months later, on January 27, 2017, the FAA sent Friedman a letter "in response to the D.C. Circuit's decision." Letter from Michael A. Berry, Federal Air Surgeon, FAA, to Eric Friedman (Jan. 27, 2017), J.A. 439 ("January 27 Letter"). The FAA began by explaining that although it "ha[s] not allowed special issuance first- or second-class medical

certification for [insulin-treated diabetics],” its “goal” was to change that, and “[t]o that end,” it was “working to develop an evidence-based framework.” *Id.* Turning to Friedman’s application, the FAA acknowledged his “assertion, supported by [his] treating physicians, that [he] demonstrate[s] excellent glycemic management as evidenced by self-monitoring with a traditional ‘finger-stick’ recording glucometer.” *Id.* That said, the FAA went on to explain why it nonetheless demanded that Friedman submit CGM data in order to obtain a medical certificate. Because the adequacy of that explanation is central to this appeal, we quote it in full:

> Current studies of the safety and efficacy of CGM devices . . . show . . . that . . . hypoglycemia remains common and frequently goes unrecognized by traditional finger-stick testing. Thus, self-monitoring using finger-stick testing alone is not an adequate mitigation strategy for operations requiring a first- or second-class medical certificate.
>
> Because it is impossible to know the true extent of glycemic variability through self-monitoring with traditional “finger-stick” tests, we have determined that a fixed period (90 days) of CGM is necessary in order to consider your eligibility for an Authorization for special issuance of a first-class medical certificate. The CGM data that we have requested will be reviewed for evidence of glycemic control and stability, as well as to evaluate the potential use of CGM as risk mitigation during operations requiring a first- or second-class medical certificate.

*Id.*, J.A. 439–40. Since Friedman had “not provided the requested CGM report and related data,” the FAA concluded,

it was "unable to consider [him] for a special issuance first-class medical certificate." *Id.*, J.A. 440.

In this petition for review, Friedman argues that the FAA "still fails to articulate a defensible rationale for denying [his] application." Pet'r's Br. 2. Again arguing that the FAA has violated both the APA and the Pilot's Bill of Rights, Friedman urges us to "remand for the FAA to (finally) grant [him] a first-class medical certificate." *Id.* at 3. The ADA has filed an amicus brief in support of Friedman.

## II.

At the outset, we emphasize the narrowness of the issue before us. Because the FAA sent its January 27 letter in response to this court's remand, the only question we must answer is whether it has "fill[ed] the analytical gap identified in [our] opinion." *Heartland Regional Medical Center v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005). Here, that gap is the FAA's failure to "offer reasons for its denial of Friedman's application." *Friedman I*, 841 F.3d at 545. In determining whether the FAA has satisfactorily provided such reasons, we are guided by well-settled principles of administrative law. We look to see whether the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," which may not neglect any "important aspect of the problem," "run[] counter to the evidence," or be "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Although we will not, as in *Friedman I*, "supply a reasoned basis for the agency's action that the agency itself has not given," *id.* at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)), we may—central to this petition—"'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" *id.* (quoting

*Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974)).

Friedman insists that the explanation the FAA provided in its January 27 letter is "no better" than that considered in *Friedman I*. Pet'r's Br. 28. This is inaccurate. In *Friedman I*, the FAA had simply demanded, without explanation, that Friedman submit CGM data. Not until its brief before this court did the FAA provide a reason, namely that the ADA panel had acknowledged CGM's value. But as we pointed out, the FAA "overstate[d] the usefulness of this concession," given the panel's conclusion that CGM was inappropriate for this purpose. *Friedman I*, 841 F.3d at 544. The agency, in other words, "[did] not identify *any FAA statements* that could be construed as explaining its denial of Friedman's application." *Id.* at 545.

By contrast, in its January 27 letter, the FAA provided its own, unequivocal medical explanation for requiring CGM data: that such data is needed to detect hypoglycemic episodes that could well be missed by traditional finger-stick monitoring. "Current studies of the safety and efficacy of CGM devices," the FAA explained, show that "hypoglycemia remains common and frequently goes unrecognized by traditional finger-stick testing." January 27 Letter, J.A. 439–40. As a result, "self-monitoring using finger-stick testing alone is not an adequate mitigation strategy for operations requiring a first- or second-class medical certificate." *Id.*, J.A. 440. The FAA thus concluded that "CGM is necessary in order to consider [Friedman's] eligibility for" a special-issuance first-class medical certificate. *Id.*

This explanation, moreover, finds support in the administrative record. In contrast to *Friedman I*, where there was a "complete absence of a relevant administrative record to

review," *Friedman I*, 841 F.3d at 545, the administrative record now before us includes "[c]urrent studies" finding that because finger-stick monitoring involves only static measurements, it often fails to detect hypoglycemic episodes occurring between tests, *see, e.g.*, Bruce W. Bode et al., *Glycemic Characteristics in Continuously Monitored Patients with Type 1 and Type 2 Diabetes*, 28 Diabetes Care 2361, 2361 (2005), J.A. 680 ("Regardless of how often fingerstick blood glucose measurements are undertaken, discrete results offer only a static picture at any point and do not provide a sense of the number, intensity, and duration of glycemic excursions."); Alberto Maran et al., *Continuous Subcutaneous Glucose Monitoring in Diabetic Patients: A Multicenter Analysis*, 25 Diabetes Care 347, 347–352 (2002), J.A. 686–91 (noting that "glucose fluctuations during the day are often missed with" finger-stick testing, *id.* at 347, J.A. 686, and concluding that a CGM device, tested on 70 diabetic patients, was accurate and well-tolerated); *see also* Timothy S. Bailey et al., *American Association of Clinical Endocrinologists and American College of Endocrinology 2016 Outpatient Glucose Monitoring Consensus Statement*, 22 Endocrine Practice 231, 232 (2016), J.A. 645 ("[P]atients' [finger-stick] monitoring may be infrequent or intermittent, their reports may be inaccurate, and overnight glucose levels are seldom measured. Given these limitations, episodes of hypo- and hyperglycemia may be missed . . . ."). CGM, on the other hand, "provides a much more rigorous measure of glycemic variability and glycemic exposure." Lisa Gilliam & Irl B. Hirsch, *Practical Aspects of Real-Time Continuous Glucose Monitoring*, 11 Diabetes Tech. & Therapeutics S-75, S-76 (2009), J.A. 721.

Friedman argues that CGM is an "inappropriate" source of data because it records clinically insignificant spikes in blood glucose and tends to lag behind and differ from finger-stick values. Pet'r's Br. 22; *see also id.* at 9–10. He fails, however,

to explain how these limitations, acknowledged by the FAA, undermine the agency's intended use of CGM data: to "augment" the finger-stick data that Friedman has already provided "to confirm his assertion that he can recognize and appropriately respond to hypoglycemic episodes." Resp't's Br. 31–32; *see also* January 27 Letter, J.A. 440 ("[S]elf-monitoring using finger-stick testing *alone* is not an adequate mitigation strategy." (emphasis added)).

Next, pointing out that "none [of the studies] addresses the medical evaluation of pilots with [insulin-treated diabetes]," Pet'r's Br. 22, Friedman maintains that the only word on the subject is that of the expert panel, which, he insists, was surely aware of the studies the FAA cites, yet concluded that "CGM data is unnecessary," *id.* The FAA, however, was not bound by the expert panel's assessment: "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts." *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378 (1989). Moreover, the FAA did not, as Friedman asserts, ignore the expert panel. Quite to the contrary, it reviewed the panel's recommendations and explained that it "require[d] more evidentiary support" than the panel had provided, January 27 Letter, J.A. 440, given that the panel "did not ground its recommendations in any evidence-based medical literature," Resp't's Br. 39.

Finally, Friedman claims that there is no reason to believe that the FAA relied on the studies it cites, as it "did not identify *any* medical studies in its terse January 2017 Letter." Pet'r's Reply Br. 14. From our perspective, it certainly would have been helpful for the FAA to have elaborated on its generic reference to "current studies." But aided by the FAA's brief, which cites and explains the relevant studies, we can "discern" the basis for its decision. *BellSouth Corp. v. FCC,* 162 F.3d

1215, 1224 (D.C. Cir. 1999); *see id.* ("'[T]he agency is not required to author an essay for the disposition of each application. It suffices, in the usual case, that we can discern the why and wherefore.'" (quoting *ICBC Corp. v. FCC*, 716 F.2d 926, 929 (D.C. Cir. 1983))). Specifically, in response to our remand, the FAA "offer[ed] reasons for its denial of Friedman's application." *Friedman I*, 841 F.3d at 545. Put another way, it can no longer be said that the agency has "not identif[ied] any FAA statements" explaining why it needs CGM data. *Id.* (emphasis omitted). Equally important, the FAA offered its explanation in accordance with APA standards: it "examine[d] the relevant data"—the medical studies and Friedman's medical record—"and articulate[d] a satisfactory explanation for its action"—that CGM data is necessary to detect hypoglycemic events that finger-stick monitoring misses. *State Farm*, 463 U.S. at 43. Friedman, moreover, has given us no basis for believing that the FAA either neglected an "important aspect of the problem," or that its position is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

We can easily dispose of Friedman's claims under the Pilot's Bill of Rights. That statute provides, in part, that the "[g]oals of the [FAA]'s medical certification process are . . . to give medical standards greater meaning by ensuring the information requested aligns with present-day medical judgment and practices" and "to ensure that . . . the application of such medical standards provides an appropriate and fair evaluation of an individual's qualifications." Pilot's Bill of Rights, Pub. L. No. 112-153, § 4(b), 126 Stat. 1159, 1163 (codified at 49 U.S.C. § 44703 note). According to Friedman, this provision requires the FAA to "align[]" its requests with "present-day medical judgment" and "provide[] an appropriate and fair evaluation." *See* Pet'r's Br. 5 (internal quotation marks omitted); *see also id.* at 21–22. That, of course, is precisely

what the FAA—as required both by our remand and the APA—has now done, and we think it quite obvious that the Pilot's Bill of Rights' aspirational, goal-setting language creates no additional obligations. *Cf. Rothe Development, Inc. v. United States Department of Defense*, 836 F.3d 57, 65 (D.C. Cir. 2016) (describing a statute's "goal[s]" as "aspirational").

## III.

For the foregoing reasons, we deny the petition for review. In doing so, we have taken the FAA at its word: that it is "working to develop an evidence-based framework" to allow special issuance of first- and second-class medical certificates to certain insulin-treated diabetics, January 27 Letter, J.A. 439, and that "should Mr. Friedman's CGM data corroborate his assertion" that he "does not pose a risk while he is in the cockpit," he will receive a certificate, Oral Argument 31:55–33:15, 38:32–40.

*So ordered.*