# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 4, 2025         Decided June 27, 2025

No. 24-1105

MICHAEL SOLONDZ,
PETITIONER

v.

FEDERAL AVIATION ADMINISTRATION,
RESPONDENT

———

Consolidated with 24-1284

———

On Petitions for Review of a Final Order
of the Federal Aviation Administration

———

*Brandon R. Nagy* argued the cause for petitioner. With him on the briefs was *Zane A. Gilmer*. *Michael E. Tucci* entered an appearance.

*Raymond Carver*, Attorney, Federal Aviation Administration, argued the cause and filed the brief for respondent. *Brett D. Weingold*, Attorney, entered an appearance.

2

Before: PILLARD and GARCIA, *Circuit Judges*, and ROGERS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:   Many Americans cope with anxiety—airline pilots included. The Federal Aviation Administration has strict guidelines as to which antidepressant medications pilots can take and the procedures they must follow to establish their medical clearance to fly.   When Michael Solondz, an experienced commercial airline pilot, was diagnosed with anxiety, he chose to take medical leave and receive professional treatment.    Various prescription antidepressant medications are effective to treat anxiety. After Solondz experienced unwanted side effects on escitalopram (Lexapro), his healthcare provider prescribed mirtazapine, which worked much better, and Solondz sought medical clearance to resume flying.  The difficulty is that, whereas the Federal Aviation Administration conditionally approved Lexapro, it has categorically disallowed pilots to fly while treated with mirtazapine.  The Administration makes case-by-case medical decisions regarding the fitness to fly of anyone taking a conditionally approved medication, but it will not consider whether Solondz or any other individual pilot taking mirtazapine is free of side effects and can fly safely.  Solondz appeals the agency's denial of his request for medical clearance.

Determinations regarding which medications categorically pose unacceptable risks and which pilots are medically fit to fly lie squarely within the sound discretion of the Federal Aviation Administration.  But the agency must reasonably explain its actions.  It has not done so here.  The agency has failed to explain why it categorically disallows medical certification to all pilots who take the medication that Solondz

was prescribed and finds beneficial, rather than permitting conditional approvals if merited under the agency's robust medical clearance process. We accordingly remand to the Federal Aviation Administration to explain its decision.

## I.

## A.

Congress has called on the Federal Aviation Administration (FAA) to "promote safe flight of civil aircraft" by promulgating regulations "necessary for safety in air commerce." 49 U.S.C. § 44701(a)(5). To that end, the FAA requires a pilot to hold both an airman certificate (also known as a pilot certificate) and a medical certificate. 14 C.F.R. §§ 61.3(a), (c), 61.23(a). The FAA Administrator is authorized to issue medical certificates, 49 U.S.C. § 44703, an authority which has been delegated to the Federal Air Surgeon. 14 C.F.R. § 67.407. There are three classes of medical certificate—first, second, and third. 14 C.F.R. Pt. 67. Because he wishes to return to work as pilot-in-command on commercial flights, Solondz seeks a first-class certificate.

Across the three classes of medical certificate, there are two categories: unrestricted certificates and Special Issuance certificates. *See* 14 C.F.R. §§ 67.3, 67.401. The Code of Federal Regulations lists all the requirements for an unrestricted first-class medical certificate, *see id*. §§ 67.101-67.115, including that a pilot is not taking any medication or undergoing any other treatment "that the Federal Air Surgeon, based on the case history and appropriate, qualified medical judgment relating to the medication or other treatment involved, finds makes the person unable to safely perform the

duties or exercise the privileges of the airman certificate applied for or held." *Id.* § 67.113(c)(1).

A pilot who is taking medication or undergoing treatment inconsistent with an unrestricted certificate may, at the discretion of the Federal Air Surgeon, obtain (or regain) a Special Issuance certificate. *Id*. § 67.401. Eligibility turns on whether "the person shows to the satisfaction of the Federal Air Surgeon that the duties authorized by the class of medical certificate applied for can be performed without endangering public safety during the period in which the Authorization would be in force." *Id.* § 67.401(a). A pilot approved for a Special Issuance certificate can operate aircraft to the same extent as a pilot holding an unrestricted medical certificate of the same class. *See id*. The Special Issuance is granted for a limited time; after it expires, the pilot "must again show to the satisfaction of the Federal Air Surgeon" that he or she is equipped to fly without endangering public safety during the period in which the Special Issuance would be active. *Id.*

According to FAA protocol, no pilot who takes antidepressant medication qualifies for an unrestricted medical certificate; each must seek to qualify for a Special Issuance. *See* Guide for Aviation Medical Examiners–Version 06/26/2024 (Joint Appendix (J.A.) 631). Historically, the FAA did not permit pilots taking antidepressants to qualify for any medical certificate, but in 2010 the agency announced a policy allowing pilots under treatment with a specified group of selective serotonin reuptake inhibitors (SSRIs) to seek a Special Issuance. *See* Special Issuance of Airman Medical Certificates to Applicants Being Treated with Certain Antidepressant Medications, 75 Fed. Reg. 17047 (April 5, 2010) (codified at 14 C.F.R. pt. 67). The agency has since amended that policy via revisions to the Guide for Aviation Medical Examiners, including by listing additional

antidepressants as conditionally approved, subject to Special Issuance. *See, e.g.*, Protocol for Antidepressants: Antidepressant Protocol Expansion – Effective April 24, 2024, https://perma.cc/HAD3-ZMFA (last updated Apr. 24, 2024). FAA policy regarding pilots under treatment with antidepressant medication has not been subject to notice and comment rulemaking, but has so far only been published as a Policy Statement and fine-tuned in the Medical Examiners' guide.

FAA policy requires any airman taking a conditionally approved antidepressant medication to undergo a six-month waiting period to enable medical observation and certification that the airman "has been clinically stable as well as on a stable dose of medication without any aeromedically significant side effects and/or an increase in symptoms." Guide for Aviation Medical Examiners (Use of Antidepressant Medications) (J.A. 632). After the six-month waiting period, the pilot must provide a statement, evaluation reports, tests, and letters in support of his Special Issuance application. *Id*. (FAA SSRI Decision Path II) (J.A. 635). An agency evaluator then reviews that material, conducts a "detailed evaluation," and makes a recommendation as to whether the pilot qualifies for the Special Issuance. *Id*.

At the time Solondz applied for Special Issuance, the conditionally approved medications were fluoxetine (Prozac), escitalopram (Lexapro), sertraline (Zoloft), citalopram (Celexa), and buproplon (Wellbutrin). *Id*. (FAA SSRI Decision Path I) (J.A. 634). The FAA has since conditionally approved four more antidepressant medications, including three serotonin and norepinephrine reuptake inhibitors (SNRIs) and one dopamine/norepinephrine-reuptake inhibitor (NDRI). *See* Antidepressant Medications, https://perma.cc/BC7N-FUPW (last updated Apr. 24, 2024). The agency has released

no information describing its criteria or process for conditionally approving antidepressant medications.

**B.**

Michael Solondz worked as a commercial airline pilot and held an unrestricted first-class medical certificate for nearly two decades. In 2018, Solondz "went through the illness and death of his father, and then the death of his father-in-law in 2019" and "the stressors of that period led him to a psychiatric consultation." 2021 Aeromedical Neuropsychological Evaluation (J.A. 157). He was diagnosed with anxiety and prescribed antidepressant medication to treat it. *Id.* In accordance with FAA regulations, he took an extended period of medical leave from his job. *See* 14 C.F.R. § 61.53(a) (prohibiting airmen from flying if they know they have a medical condition that would make them "unable to meet the requirements for the medical certificate necessary for the pilot operation"). Solondz's medical provider first prescribed Lexapro, one of the antidepressants the FAA had conditionally approved, to manage Solondz's anxiety.

When Solondz experienced unwanted side effects from Lexapro, including dizziness and lightheadedness, his provider instead prescribed Remeron (known generically as mirtazapine), which he took regularly from August 2020. Remeron is a tetracyclic antidepressant, as opposed to the SSRI, SNRI, and NDRI medications that the FAA has conditionally approved. Solondz found Remeron effective in controlling his anxiety and associated insomnia without negative side effects. By taking the medication at night, on medical advice, Solondz avoided experiencing the daytime sedation or lingering fatigue that can be side effects of Remeron.

By August 2021, Solondz felt ready to return to work as a pilot. He notified the FAA that he was taking Remeron and requested Special Issuance of a first-class medical certificate. In September 2021, the agency denied that request, stating that Solondz's history of anxiety and sleep disturbance, as treated with Remeron, disqualified him from medical certification. Solondz submitted two more requests for Special Issuance, one in January 2022 and another, accompanied by new medical reports, in February 2023. By letters dated July 2022 and April 2023, respectively, the FAA denied each of those follow-up requests.

Like the FAA's September 2021 denial, the July 2022 Denial Letter cited Solondz's record of anxiety, insomnia, and ongoing treatment with Remeron. It stated that the agency would reconsider Solondz's request for Special Issuance if he discontinued Remeron. The agency added in its July 2022 letter that if Solondz did discontinue Remeron he would need to submit information about other conditions referenced in his medical record, including obstructive sleep apnea treated with continuous positive airway pressure (CPAP), potential malignant melanoma, and optic neuritis (an inflammation of the optic nerve). The April 2023 Denial Letter cited as justifications a slightly different list of medical concerns in addition to his treatment with Remeron. It noted sleep apnea, omitted any reference to optic neuritis or a malignant melanoma, and for the first time cited an incident of atrial fibrillation Solondz had experienced in 2001.

Solondz submitted a request for reconsideration in May 2023, which the agency denied via two communications. First, the Aerospace Medical Certification Division issued a letter dated April 2024 notifying Solondz that his request was denied. The grounds it listed were Remeron use, anxiety disorder, sleep apnea treated with CPAP, and atrial fibrillation.

Solondz promptly petitioned this court for review. Petition for Review, *Solondz v. FAA*, No. 24-1105 (D.C. Cir. May 2, 2024). The FAA, however, contends that its April 2024 letter did not constitute final agency action and is not subject to our review. The Federal Air Surgeon issued an additional letter in July 2024 denying the request for reconsideration (the Final Denial Letter). That letter reiterated Remeron and sleep apnea treated with CPAP as reasons for denial, but reintroduced optic neuritis and malignant melanoma to the mix. Solondz timely filed a new petition for review of that denial. Petition for Review, *Solondz v. FAA*, No. 24-1284 (D.C. Cir. Aug. 26, 2024).

The two petitions are now consolidated before us. The April denial letter from the Aerospace Medical Certification Division and the July Final Denial Letter from the Federal Air Surgeon both purported to act on the same motion Solondz filed seeking reconsideration. Solondz described the July Final Denial Letter that led to his petition in No. 24-1284 as also "the final agency action under review" in No. 24-1105. *See* Underlying Decision from Which the Petition Arises, *Solondz v. FAA*, No. 24-1105 (D.C. Cir. July 23, 2024). The parties filed a single set of briefs in the consolidated cases and neither party asserts that any differences in the letters affect the merits or the relief. Accordingly, and because we agree with the parties that the Final Denial Letter constitutes final agency action, we dismiss the petition in No. 24-1105 as moot and proceed to the merits in No. 24-1284.

## C.

The Federal Air Surgeon's Final Denial Letter concludes that Solondz did not qualify for a Special Issuance for three reasons. First, she found that Solondz's use of Remeron could endanger aviation safety because the medication "is known to

have a significant side-effect of sedation or somnolence." J.A. 12. She cited the Food and Drug Administration's prescribing information for mirtazapine, which warns that "somnolence is reported to be a side effect in over half of those treated for depression with mirtazapine for 6 weeks." J.A. 12. Acknowledging a study cited by Solondz "that sedating effects may be less when mirtazapine is used in higher therapeutic dosages," she responded that "[t]his paper does not refute the possibility of mirtazapine still causing sedating effects." J.A. 12. She then cited a 1998 study finding that, after sixteen days of treatment, the medication was associated with impaired driving performance. J.A. 12-13. She stated that she was "unable to conclude that the likelihood of sedation that is known to occur with mirtazapine is sufficiently low to assure safety while operating an aircraft in the national airspace." J.A. 13. She then noted the FAA's April 2024 conditional approval of additional medications that may be used to treat anxiety, stating that "[t]hese medications are reported to have a much lower risk of somnolence or sedation than does Remeron (mirtazapine), and after detailed review by the FAA it is determined that Special Issuance may be considered on a case by case basis for individuals being treated with these medications"—but not individuals treated with Remeron J.A. 13.

In his petition for review, Solondz asserts that he submitted evidence to the FAA demonstrating that Remeron has not caused him any significant side effects. For example, he cites a 2021 neuropsychological evaluation from an aviation psychologist that reported no "aeromedically significant" findings regarding Solondz's neurocognitive functioning and found his performance in cognitive testing "quite strong." 2021 Aeromedical Neuropsychological Evaluation (J.A. 162). Solondz notes that a 2023 follow-up evaluation by the same aviation psychologist reported that his neurocognitive

performance was "wholly within normal limits" and without "aeromedically significant" findings. J.A. 204.

The Air Surgeon's second stated ground for denying the Special Issuance was that Solondz suffered from optic neuritis, which she concluded posed a danger to aviation safety because there is a "25-50% risk of individuals with optic neuritis developing multiple sclerosis within 15 years." J.A. 13. Solondz acknowledges that he was diagnosed with optic neuritis but pointed out that it had been resolved before July 2022—as reflected in medical records he had submitted to the FAA long before it acted on the application at issue here. Solondz also notes that the FAA had never previously identified optic neuritis in support of its letters disqualifying him. The agency had only once even mentioned that condition: In 2022, the agency sought additional information regarding a medical record diagnosing optic neuritis, to which Solondz responded with documentation showing the condition had been resolved. *See* July 2022 Denial Letter (J.A. 379) (requesting further information regarding optic neuritis diagnosis); April 2023 Denial Letter (J.A. 68) (making no mention of optic neuritis).

The Air Surgeon's third stated rationale for the Final Denial Letter was that Solondz's medical record contained a diagnosis of malignant melanoma. She had made no mention of melanoma in the underlying denial letter as to which Solondz unsuccessfully sought the reconsideration at issue here. And the Air Surgeon's Final Denial Letter itself acknowledged that the cited clinical note from Solondz's dermatologist described a diagnosis of "melanoma in situ," not malignant melanoma. J.A. 13. Yet the Final Denial Letter noted that malignant melanoma, where present, "carries a high risk of spread or metastasis, including high risk of spreading to the brain where it may cause cognitive problems or seizures."

J.A. 13. Solondz contends that he has never been diagnosed with malignant melanoma, has undergone skin checks every six months for more than a decade, and that a recent medical evaluation stated that his melanoma "prognosis is excellent without expected progression to invasive or metastatic disease." Solondz Br. 47-48 (quoting J.A. 196).

As an additional basis for denial, the Air Surgeon asserted that Solondz had failed to disclose the optic neuritis or the melanoma in his application for Special Issuance. Solondz contends that he disclosed both conditions in prior Special Issuance applications and consistently provided the FAA with all the relevant records. *E.g.*, Solondz Br. 40-41, 47-48.

Finally, the Air Surgeon noted Solondz's diagnosis of obstructive sleep apnea and stated that, to be considered for certification, Solondz would have to use a treatment that complies with FAA guidelines. Solondz contends that he had submitted medical records demonstrating that his condition was well managed and that he intended to continue to comply with the FAA's requirement to use a continuous positive airway pressure (CPAP) device during sleep. Solondz Br. 50-51 (citing Airman Compliance with Treatment: Obstructive Sleep Apnea (OSA) form (J.A. 199)).

## II.

We have jurisdiction to review the Final Denial Letter as a final order of the FAA. 49 U.S.C. § 46110(a). The decision whether to grant a Special Issuance medical certificate lies within the sound discretion of the agency, acting through the Federal Air Surgeon. Our review is limited to whether an application denial was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Erwin v. Fed. Aviation Admin.*, 23 F.4th 999, 1006 (D.C. Cir. 2022) (quoting *Boca Airport, Inc. v. Fed. Aviation Admin.*, 389 F.3d

185, 189 (D.C. Cir. 2004)). We may not "substitute our judgment for that of the agency," nor may we "supply a reasoned basis for the agency's action that the agency itself has not given." *Id.* (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (formatting altered). An agency's action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. If we determine that it was arbitrary and capricious, we may "amend, modify, or set aside any part" of the FAA's final order and may direct the agency to conduct further proceedings. 49 U.S.C. § 46110(c). Finally, the FAA's factual determinations are conclusive only if supported by substantial evidence. *Id*.

While the Final Denial Letter lists several reasons for the Air Surgeon's decision, Solondz contends that his use of Remeron is the operative justification for the denial. Accordingly, our analysis begins there. We conclude that the Final Denial Letter was arbitrary and capricious because the FAA has not adequately articulated a rationale for its policy categorically barring pilots under treatment with mirtazapine (Remeron) from Special Issuance medical certification.

The FAA offers one overriding justification for denying Solondz's Special Issuance application: It asserts that FDA prescribing information and available medical studies establish a high incidence of somnolence among people who take mirtazapine. But the agency has failed to articulate a clear connection between the evidence in the record—that treatment with mirtazapine generally poses a risk of excessive

drowsiness—and the rule it has applied here, refusing to consider whether, contrary to the evidence of drowsiness in the general run of cases, an individual pilot's mirtazapine treatment causes him no unusual drowsiness. The structure of the FAA's Antidepressant Protocol underscores the disconnect between the cited evidence and the rule. An airman must take an approved antidepressant for six months in advance of medical assessment for a Special Issuance. That treatment period allows the pilot and medical professionals to discern whether medication as prescribed is causing any significant side effects to the applicant. An Aviation Medical Examiner then conducts an individualized medical assessment, which includes a detailed, face-to-face, in-office evaluation as well as review of records from the applicant's treating physician, psychiatrist, and neuropsychologist, among other documentation. *See* 14 C.F.R. § 183.21(c); HIMS AME Checklist—SSRI Initial Certification/Clearance (J.A. 638).

The Final Denial Letter, the administrative record, the FAA's brief on appeal, and FAA counsel's responses to questioning during oral argument do not offer a reasoned explanation why the Administration categorically disqualifies pilots taking mirtazapine from obtaining conditional medical certification through the Special Issuance process. The six-month waiting period and individualized medical assessment are apparently designed to keep the skies safe by identifying pilots experiencing side effects of prescribed medications that could interfere with pilot performance. And there are, no doubt, medical treatments that the FAA may categorically conclude are inconsistent with safely piloting commercial aircraft. But the agency has yet to explain why a pilot taking mirtazapine at night at a dosage that apparently does not produce in him the drowsiness clinically observed in other patients is barred from using the demanding Special Issuance process to seek to establish to the Federal Air Surgeon's

satisfaction that he suffers no aeromedically significant side effects.

In the Final Denial Letter, the FAA noted that it recently granted conditional approval for four antidepressants, in addition to the initial five SSRIs, that are "reported to have a much lower risk of somnolence or sedation that does Remeron (mirtazapine)." J.A. 13. The agency had concluded, "after detailed review," that airmen treated with those medications could be considered for Special Issuance on a case-by-case basis. J.A. 13. The FAA has not made public the key findings or reasoning of that review. While "[t]he agency is not required to author an essay for the disposition of each application," the court must be able to "discern the why and wherefore" of the agency's decision-making process. *Friedman v. Fed. Aviation Admin.*, 890 F.3d 1092, 1099 (D.C. Cir. 2018) (quoting *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1224 (D.C. Cir. 1999)). The key missing piece of information here is how the agency determined that those other medications, which apparently also carry some risk of drowsiness in some people, need not bar the pilots taking them from consideration for Special Issuance whereas mirtazapine does impose a categorical bar.

It is also unclear how the FAA resolved apparent contradictions between the medical studies on which it relied and its conclusion that mirtazapine is categorically disqualifying. In the Final Denial Letter, the agency cited a 1998 study to support its conclusion that, after sixteen days of treatment with mirtazapine, subjects showed impaired driving performance. J.A. 12-13 (citing J.G. Ramaekers, et al., *Effects of Nocturnal Doses of Mirtazapine and Mianserin on Sleep and on Daytime Psychomotor and Driving Performance in Young, Healthy Volunteers*, Human Psychopharmacology: Clinical and Experimental 13, S87-S97 (1998) (J.A. 662-672)). The

same study noted that "[a]pparently, [mirtazapine's] sedating effect[] on daytime performance [is] much alleviated by nocturnal administrating." J.A. 671.

In its brief on appeal, the FAA highlights risks of mirtazapine by reference to two ensuing studies. To rebut the offsetting effect of evening dosing, it cites a 2005 study concluding that subjects who took an evening dose of mirtazapine had "'significantly impaired'" driving performance—"although the impairment decreased after repeated dosing." FAA Br. 30 n.9 (quoting Marleen Wingen et al., *Actual Driving Performance and Psychomotor Function in Healthy Subjects After Acute and Subchronic Treatment with Escitalopram, Mirtazapine, and Placebo: A Crossover Trial,* 66 J. Clin. Psychiatry 436 (2005) (J.A. 675-682)). According to that study,

> [n]one of the effects were present after 1 or 2 weeks of repeated dosing. The absence of mirtazapine impairment after repeated dosing is probably related to the development of tolerance . . . The implication is that driving under the influence of a sedative antidepressant such as mirtazapine should only be contraindicated during the acute phase of treatment.

Wingen, *supra*, at 443 (J.A. 682). The agency also cited a 2024 study for its finding that mirtazapine "caused 'significant impairment' in driving performance after the first administration." FAA Br. 30 n.9 (quoting Michele Fornaro et al., *Residual Effects of Medications for Sleep Disorders on Driving Performance: A Systematic Review and Network Meta-Analysis of Randomized Control Trials,* 81 European Neuropsychopharmacology 53 (2024) (J.A. 683-693)). According to that study, effects on subjects taking mirtazapine "paralleled placebo at the study endpoint, notwithstanding [that

mirtazapine] caused significant impairment after the first administration." Fornaro et al., *supra*, at 60 (J.A. 690). The FAA has not explained how it accounted for evidence of the initial side effects' disappearance over time.

We do not—and cannot—substitute our judgment about the content of these studies for the FAA's own. But it is our duty to identify material gaps in the agency's articulated rationale. The mirtazapine studies suffice to support a requirement that pilots in Solondz's situation submit to the controls inherent in a Special Issuance. The six-month waiting period and case-by-case scrutiny of airmen's neuropsychological condition that are built into the Special Issuance process afford the FAA the opportunity to determine in each individual case whether, for example, nocturnally administered mirtazapine caused sedative effects after the acute treatment phase. But the agency's position implies that it believes the risk of somnolence from mirtazapine is so severe, persistent, or unpredictable that the guardrails within the Special Issuance process, as called for by the Antidepressant Protocol, are insufficient to protect aviation safety. If that is the case, the FAA must articulate and support its reasoning. We cannot fill in the blanks by supplying a reasoned basis for the FAA's policy that the agency itself has not given. *Erwin*, 23 F.4th at 1006 (quoting *State Farm*, 463 U.S. at 43)). The agency's discretion is not unbounded. If it fails to articulate a "rational connection between the facts found and the choice made," we cannot sustain its action as a sound, non-arbitrary exercise of medical judgment. *State Farm*, 463 U.S. at 43 (citation omitted).

To be clear, we do not question the FAA's authority to categorically deny medical certification to pilots who are using certain prescription medications. Yet, when an agency adopts a substantive policy without rulemaking or public comment

and applies it in a particular case, it is especially important that it meet "its responsibility to present evidence and reasoning supporting" that policy. *Pacific Gas & Electric Co. v. Fed. Power Comm.*, 506 F.2d 33, 38-39 (D.C. Cir. 1974). The FAA's thin and variable explanations in the Final Denial Letter and in its brief on appeal do not satisfy that standard. We therefore vacate and remand the Final Denial Letter for further explanation as to why the FAA categorically disallows Special Issuance medical certification to all pilots who take mirtazapine instead of proceeding case-by-case to determine whether an individual pilot can demonstrate that he suffers none of the risk-elevating side effects.

Because the FAA's ability to articulate a reasoned rationale for the categorical disqualification of airmen taking mirtazapine is, at this juncture, dispositive, we need not address the agency's other rationales for denying Solondz's Special Issuance application. We do note, however, that the agency's previous denial letters displayed shifting justifications that were, in some instances, illogical. For example, in its April 2023 denial letter, the agency cited atrial fibrillation as a reason to deny the Special Issuance—even though the atrial fibrillation incident occurred in 2001, was promptly reported to the FAA, and did not prevent Solondz from obtaining an unrestricted medical certificate from 2004 through 2020. Tellingly, in its ensuing letters denying reconsideration, the agency did not cite atrial fibrillation. The agency's reconsideration denial did, however, cite optic neuritis, despite Solondz having submitted recent eye exams stating that the condition is resolved. And it cited malignant melanoma and the risk of metastasis to the brain, despite having on file a recent medical report confirming that he never had that diagnosis. If the FAA determines that it should give Solondz's application renewed consideration for Special Issuance, it must take care

to avoid "offer[ing] an explanation for its decision that runs counter to the evidence" before it. *State Farm*, 463 U.S. at 43.

The petition for review is therefore granted. The Final Denial Letter is vacated and the case remanded to the FAA for further proceedings consistent with this opinion.

*So ordered.*